OPINION EN BANC
LYNCH, Circuit Judge.
Petitioner John M. McCambridge appeals the district court’s denial of his ha-beas corpus petition challenging the constitutionality of his state conviction for manslaughter. A panel of this court had earlier reversed the district court and granted his petition, holding: (1) that the prosecution failed to disclose exculpatory evidence and improperly took advantage of the absence of this evidence in its closing arguments, in violation of McCambridge’s right to due process; and (2) that the Massachusetts Appeals Court decision holding otherwise was contrary to and an unreasonable application of clearly established Supreme Court law. McCambridge v. Hall, No. 00-1621, slip op., .2001 WL 1097770 (1st Cir. Sept. 24, 2001). That opinion was withdrawn when the full court subsequently granted the Commonwealth’s petition for en banc review. We now affirm the district court’s denial of habeas corpus.
I.
John McCambridge was charged in 1994 with first degree murder, weapons viola *26 tions and various motor vehicle offenses. The charges arose out of a shooting and a motor vehicle accident involving McCam-bridge and the victim, Richard Doyle. McCambridge admitted to the shooting and said he acted in self-defense. The jury rejected the murder charge and the charge that he was operating a motor vehicle after his license had been revoked or suspended, but it convicted him of manslaughter, unlawful possession of a firearm, operating a motor vehicle under the influence of alcohol, and reckless operation of a motor vehicle. He is currently serving a sentence of fifteen to twenty years.
We describe the facts pertinent to the grounds of decision as they were found by the state court, Commonwealth v. McCambridge, 44 Mass.App.Ct. 285, 690 N.E.2d 470 (1998), fleshed out by other facts contained in the record and consistent with the state court findings. We are bound to accept the state court findings of fact unless McCambridge convinces us, by clear and convincing evidence, that they are in error. 28 U.S.C. § 2254(e)(1). On no point has he done so.
McCambridge and Doyle were drinking friends and former co-workers. The two had been out drinking together at a bar in Cambridge on the night of the incident, which occurred in the early hours of November 11, 1993. At the bar, McCam-bridge argued with the bartender, screaming at him either because of the television set, or because of McCambridge’s attentions to the bartender’s girlfriend. Leaving the bar around one a.m., Doyle and McCambridge drove off together in Doyle’s van.
At about two a.m., a state trooper observed a traffic disturbance on the Southeast Expressway, which was caused by the van weaving through the southbound lanes and driving unusually slowly, about forty miles per hour, on this major road. The trooper turned on his lights and siren in an attempt to pull over the van, but the van continued to weave through the lanes. The van then accelerated to between fifty miles per hour and sixty-five miles per hour and swerved into the cement curbing on the right shoulder of the Expressway. After the van hit the right shoulder, it fishtailed across the road, turning perpendicular to the Expressway and slowing to a speed of about thirty-five miles per hour. The van then struck the cement center median head-on, hitting first on the front right side, then with the whole front of the van. The van went up into the air, rising several feet, and landed with the driver’s side down, facing the wrong way down the road. The van then skidded backwards about ten feet, rotating 360 degrees as it slid. The trooper also said that, as the van went into the center median, he saw a head in the driver’s seat area; the head smashed into the windshield as the van hit the ground. The trooper estimated that about two minutes passed from when he first saw the van until the crash, and that the van had traveled about two or two-and-a-half miles, weaving and then crashing.
A second witness, an off-duty state trooper, saw the van weaving through the Expressway lanes, then fish-tailing into the right shoulder, crossing the Expressway into the center median, rising up into the air, and landing on the driver’s side. A third witness saw the van weaving across lanes, then actually rocking back and forth before it hit the right shoulder, at which point it shot straight across the road into the center median, and flipped onto its side, landing with the driver’s side down on the pavement.
The trooper and other witnesses found McCambridge in a fetal position in the area of the driver’s seat, bleeding from a head injury. Rescue personnel had to remove the van windshield in order to free *27 McCambridge from the vehicle. As the rescue personnel were removing McCam-bridge’s outerwear, a derringer pistol fell out of his clothing.
Doyle had been thrown from the van and his head was pinned under the driver’s side rear wheel so that only his body was visible. His clothing had been torn off around the neck area, leaving his chest completely exposed. The state troopers at the scene reported that his skin appeared blue or grayish, he was not breathing and he had no pulse, although one paramedic testified that Doyle was still warm to the touch when the paramedic arrived. There was no attempt to resuscitate him. Doyle was pronounced dead upon arrival at the hospital. He had been shot once in the right cheek and once in the back (in the area of the right shoulder). He also had a head wound indicating that the back of his head had struck or been struck with a linear object that was at least three inches in length and had no sharp or rough edges. Doyle’s blood alcohol level was 0.22%.
In the van, the troopers found a Smith & Wesson semiautomatic pistol; the safety was off and the gun was cocked, loaded, and ready to fire. The police also found a billy club with blood on it that was consistent with Doyle’s blood type and two boxes of ammunition, each corresponding to one of the two guns. Doyle had been living in the van prior to the crash, and the van was used by a homeless advocacy organization to transport individuals to shelters.
The prosecution’s theory at trial was that McCambridge had shot Doyle and was driving the van, en route to dumping the body, when the crash occurred. McCambridge admitted shooting Doyle, but argued he did so in self-defense. More specifically, McCambridge claimed that Doyle, in a drunken rage, was threatening to shoot him for implying that Doyle was a child abuser. McCambridge says that the derringer was Doyle’s, which Doyle himself had placed on the dashboard, as he was on his way to sell the gun to a customer in Quincy.
McCambridge testified that the argument in the van had its genesis in a conversation between Doyle and himself, a month or so before the shooting. In that conversation, McCambridge says he told Doyle that he had heard Doyle had been convicted for child abuse. Doyle, after initially denying the charge, admitted it was true, said he had done his time for it, and said he didn’t want to hear any more. Doyle told McCambridge that “if [McCam-bridge] ever threw it up to him, his face again ... he’d put a bullet in [McCam-bridge’s] frigging head.”
Despite this warning, McCambridge says he raised the topic again in the van, just prior to the shooting. McCambridge testified that the argument began after leaving the bar, when McCambridge asked Doyle, who was driving, to give him a ride to his ex-wife’s house. Doyle said he had to make a phone call and left the van. When he returned, Doyle said he had to go to Quincy because he had a customer for a derringer pistol. Doyle pulled the derringer out from under the seat and threw it on the dashboard. McCambridge again asked to be taken to his ex-wife’s, but Doyle drove on toward Quincy. This angered McCambridge and so he told Doyle he was drunk and called Doyle a name implying that Doyle had abused a child. McCambridge testified that Doyle then pulled out a nine-millimeter Smith & Wesson from his waist band, and threatened McCambridge with it. McCambridge testified that he pushed downward on Doyle’s right hand, while Doyle pushed upwards, and that he begged Doyle to put the gun down. At the same time, McCambridge says he grabbed the derringer from the dashboard. He saw Doyle cock the ham *28 mer of the Smith & Wesson, so he shot Doyle in the face with the derringer. McCambridge testified he had no memory of anything else until he woke up in the hospital.
According to a ballistics expert’s testimony at trial, Doyle had been shot with the derringer pistol that fell out of McCambridge’s clothing at the accident scene. The ballistics expert testified that the derringer needed to be manually loaded, would only bear two cartridges, and needed to be manually cocked each time the weapon was fired. He further testified that it would take between thirteen and sixteen pounds of pressure to pull the trigger, which he characterized as “a very heavy trigger pull.” He also testified that he would expect a considerable flash when the gun was fired, “enough to instantaneously brighten a darkened room.” The state trooper pursuing the van testified that he saw no flash or other light from the van’s interior.
A forensic chemist testified at trial for the prosecution that, in her opinion, Doyle was shot while he was in the driver’s seat of the van; but at the time of the accident, Doyle was probably near the sliding passenger’s side door and McCambridge was in the driver’s seat. This supported the prosecution’s theory of the case, which was that McCambridge had shot Doyle sometime after leaving the bar, and then deposited his body in the back of the van. She testified that Doyle’s blood was spattered in a downward and outward direction on the driver’s side door in a manner suggesting a high-velocity impact, such as from a gunshot wound, with blood dripping down the door. This indicated that the van was in an upright position when the blood spattered on the door. She testified that the hardening around the edges of blood droplets suggested that the blood on the upper part of the window remained undisturbed for about three minutes and that the larger quantities of blood, dripping down the driver’s side door, were undisturbed for at least five minutes.
Blood matching Doyle’s type was found on the driver’s seat and had soaked through the upholstery into the cushion, and a pool of Doyle’s blood type had collected under the driver’s seat. There was also blood on the seat of McCambridge’s jeans that was consistent with Doyle’s blood; the forensics expert testified that the stain was consistent with McCam-bridge sitting in blood, rather than merely wiping up against blood. More of the Doyle-type blood was found on the front leg of McCambridge’s jeans; on a jacket belonging to' McCambridge, which the police found in the back of the van after the crash; and on the billy club found in the van. Doyle’s blood was also on the passenger’s side sliding door, which was off the hinges at the bottom, and open “like a flap.” Fibers from Doyle’s sweater were fused to the lower portion of the sliding door, indicating that the sweater had struck the door with great force. She also testified that, based on the stippling marks on Doyle’s clothing, she believed the gunshot wound in Doyle’s back was caused by a shot fired from a distance of three feet or greater.
As for McCambridge, the forensics expert found tissue, hair and blood on the upper passenger’s side corner of the windshield and on the passenger’s side dashboard that appeared to be McCambridge’s, as well as on the rear-view mirror (which was detached from its proper place). McCambridge’s blood was also found on his sweater and the jacket he was wearing at the time of the crash. The expert also found glass fragments from the windshield and the passenger’s side window in McCambridge’s clothes, indicating that McCambridge was probably in contact *29 with the passenger’s side window when it broke. (There was no such evidence that Doyle had come in contact with the broken windshield.)
The Commonwealth had a specialist in accident reconstruction testify. He supported the witnesses’ memories of the crash, and opined that Doyle’s body must have been ejected from the flapping passenger’s side sliding door at the first impact. He also testified that, upon impact, the occupants of the van would have been thrown forward and to the right. He further testified that the driver was likely to have been pinned behind the wheel.
The medical examiner who testified for the Commonwealth stated that the manner in which Doyle’s impact wounds bled suggested that it was possible that he was still alive at the time of the crash, but that he could not be sure. He based this upon the fact that there was blood in the tissues surrounding the impact abrasions, which could indicate that Doyle’s heart was still pumping blood at the time of impact, but that could also be caused by the body being turned multiple times.[1] The medical examiner’s opinion was that Doyle was shot first in the cheek, from a distance of six to eight inches to the right of the right cheek; this shot probably ‘ would have killed Doyle within eight minutes. He stated that the second gunshot, to the upper right back shoulder area, severed Doyle’s aorta and thus probably would have killed Doyle in less than two to three minutes, and definitely in less than eight minutes. He also concluded that, based on the amount of blood that Doyle had inhaled into his lungs, Doyle had time to take at least a few breaths between the two shots. Based on Doyle’s blood alcohol content-and the fact that Doyle had absorbed all the alcohol in his stomach, the medical examiner estimated that Doyle had stopped drinking about ninety minutes prior to being killed. The medical expert also testified that Doyle’s head wound was consistent with a blow from a billy club, such as was found in the van.
McCambridge’s forensics expert testified that, upon impact, the passenger would be propelled forward into the right-hand corner of the windshield, but that the steering wheel and console could prevent the driver from hitting the windshield, instead sending the driver back, through the twenty-nine inch space between the front bucket seats, and out the passenger’s side sliding door. He further testified that the derringer has an average muzzle energy of 95 foot pounds, roughly equivalent to a punch from a professional boxer, whereas the Smith & Wesson has an average muzzle energy of 355 foot pounds. Due to the relatively weak muzzle energy of the derringer, he testified that it was possible for Doyle to have been shot once and still have remained conscious, active, and possibly even more aggressive because of the wound.
Since the habeas issue asserted is based on the question of evidence as to whether or not Doyle had been convicted of child abuse, we go into detail on this point. At trial, the prosecution called Doyle’s brother. During the testimony, McCambridge’s counsel asked for a side-bar and informed the court that, if the Commonwealth planned to challenge the truth of Doyle’s conviction for child abuse, he would like the opportunity to cross-examine Doyle’s brother about whether Doyle had served time for child abuse.[2] At that point, the *30 prosecution said it was not certain whether it intended to challenge the truth of the conviction. The court said that it would keep Doyle’s brother available to be recalled as a witness if the prosecution decided to argue that Doyle had not been convicted.
Later, during McCambridge’s testimony, the prosecutor objected on hearsay and prejudice grounds to McCambridge referring to Doyle’s conviction. The prosecutor said the prejudice outweighed any probative value. The court asked if there was a conviction on the charge. Defense counsel represented there was a conviction, but said “whether it’s true or not in some ways is irrelevant.” At that point, the judge asked counsel whether either had checked Doyle’s probation record. The prosecutor replied, “It just says — it doesn’t say what for. I have no idea what it’s for.” The judge allowed McCambridge to testify to his first conversation with Doyle about the conviction, agreeing that it went to McCambridge’s state of mind, which was relevant to the self-defense theory, and not for the truth of the conviction, which was not relevant to self-defense. On cross-examination of McCambridge, the prosecutor raised the issue of the conviction, and then asked, “You know Mr. Doyle is deceased?,” to which McCambridge answered yes. The prosecutor then asked, “He can’t refute your allegations right now; can he?” The defense objected to that question, and the objection was sustained.
Near the conclusion of the defense’s case, defense counsel requested a side-bar to clarify whether he needed to recall Doyle’s brother. That turned, he said, on whether the prosecution intended to impugn McCambridge’s credibility by arguing that Doyle had never been convicted or in jail, when there was no evidence either way on this point. The prosecutor took the position that Doyle had not been in jail, that the defense counsel could ask the question of Doyle’s brother if he wanted, and that it was up to the defense, not the prosecution, to put Doyle’s criminal record into evidence. When asked by the court, the prosecutor said, “He wasn’t in jail, Judge,” and then, when the court further asked if Doyle was convicted, the prosecutor responded “No. No.” The prosecutor said all he had seen on the record was spousal abuse, “so far as [he knew, Doyle] had never been in jail,” and that was all he could say on the matter.
Defense counsel said he did not have access to the criminal record and would like it produced. He said he did not want to make it part of the ease but that he “d[id]n’t want to open it up for argument that [he] didn’t prove that [Doyle] had one, and, therefore, [McCambridge] was lying.” The court asked the prosecution what it intended to argue on the issue. The prosecutor replied that he had no problem if the defendant called the brother “because, as far as I know, there is no record that Mr. Doyle had any convictions.” When the judge inquired further, the prosecutor said he should not be put in the position of disclosing what his closing argument would be. He foreshadowed what he might do by saying McCambridge “gets up there and says [Doyle’s] done time when I know he hasn’t from the records I’ve seen. And if [McCambridge has] got the record, he can [attempt to introduce it.]” The court then interjected that the information had come in only for the state of mind of the defendant. The prosecutor said that was all he was going to argue.
In his closing argument, the defense counsel was careful to emphasize that McCambridge’s testimony about Doyle’s conviction was offered only to show his state of mind and that there was no evidence that Doyle ever molested or abused any child. He stated that “[t]here is sim *31 ply no evidence one way or another.... There is no evidence that he did it. There is no evidence that he didn’t do it. It was admitted for ... the state of mind.” The prosecutor, in turn, in his closing referred to the earlier conversation:
Does the defendant have something for you to believe when he gets up there and says, oh, yeah, I had an argument with Richard Doyle because of child molestation? There is absolutely evidence of that. Was that put in there to tell you what his frame of mind was? No. That was his third shot at the victim from the stand, assassinating his reputation with no evidence. That’s what that was for, I suggest to you, not to show state of mind.
Literally read, the prosecution admitted there was evidence that defendant had an argument with Doyle in the aftermath of the child abuse accusation, but that the real purpose for the testimony was to.impugn the victim, not to show McCam-bridge’s state of mind.[3] Defense counsel did not object to the prosecution’s closing statement. Nor was the closing statement presented as error to the state courts on McCambridge’s direct appeal.
II.
McCambridge appealed his conviction to the Massachusetts Appeals Court, presenting three main arguments: that the derringer and his clothes were the product of art unlawful search and seizure and should have been suppressed; that the jury should have been instructed on the possibility of a necessity defense to the firearms charge; and that “the trial court erred by not requiring Doyle’s criminal record to be made part of the record, and the prosecutor may have violated the defendant’s state and federal due process rights by not disclosing that record.” On this third argument, McCambridge argued:
The suppression of material evidence favorable to the accused and requested by him violates the due process clause of the Fifth Amendment. Brady v. Maryland, 373 U.S. 83, 87 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963). In the case at bar, because the trial court refused to require the Commonwealth to produce Doyle’s criminal record, the defendant cannot prove that exculpatory evidence was withheld.... Thus, this Court should order the Commonwealth to produce Doyle’s criminal record so that an appellate decision can be made. In the alternative, the case should be remanded to the Superior Court for production of the document at issue.
The Commonwealth responded that McCambridge had not requested that Doyle’s record be marked as an exhibit until the sentencing stage, that the proper means for challenging a failure to disclose exculpatory evidence would have been through a motion for new trial under Mas *32 sachusetts Rule of Criminal Procedure 30(b), and that the conviction record was not material to the verdict because “the jury clearly believed the defendant’s testimony regarding a confrontation with the victim,” since they convicted him only of manslaughter.
After filing its brief with the state appeals court, the Commonwealth filed a Motion to Expand the Record to include Doyle’s criminal record, which did in fact contain a conviction for child neglect and a notation that Doyle served six months in jail for this conviction. The Commonwealth’s motion explained that, at trial, the prosecutor had only a partial print-out of the record, which had no mention of the child neglect conviction, and included as an appendix a copy of this truncated printout.
In his reply brief, McCambridge argued that “the Commonwealth has now disclosed that exculpatory evidence was withheld at trial” and, citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), maintained that he was entitled to a new trial.
On appeal, the Massachusetts Appeals Court held:[4]
Failure to mark Doyle’s criminal record for identification. The defendant requested the trial judge at the sentencing hearing to mark Doyle’s criminal record as an “exhibit.” The judge denied the request and the defendant claims it was error, for the record was necessary to support his claim that the prosecution had withheld exculpatory evidence from him. The defendant claimed that Doyle’s record would have supported his claim that Doyle had been convicted of child abuse, which would have corroborated the defendant’s testimony at trial that Doyle pulled a gun on him when the defendant called Doyle a name indicating he was a child abuser, which accusation on a prior occasion had prompted Doyle to threaten the defendant’s life if he ever accused him of this offense again. While the defendant pressed for the introduction of the victim’s criminal record at trial, he did not object when the judge did not order its production or request that the record be marked for identification. He cannot now be heard to complain that the judge failed to do so at the sentencing stage.
In any event, assuming without deciding that the prosecutor should have produced the victim’s record, there was no prejudice to the defendant because he was aware of the victim’s record and was prepared to offer such evidence at trial. Moreover, by convicting the defendant of manslaughter, the jury obviously credited the defendant’s testimony that the struggle in the van was precipitated by the defendant’s remark about this offense to Doyle. See Commonwealth v. Tucceri, 412 Mass. 401, 412-14, 589 N.E.2d 1216 (1992).
McCambridge, 690 N.E.2d at 475. In essence, the court held that McCambridge had forfeited the issue at trial and could not resuscitate it by raising it at sentencing. It also held in the alternative that McCambridge suffered no prejudice from the absence of Doyle’s record.
McCambridge then filed an application to obtain further review with the Massachusetts Supreme Judicial Court (SJC). He argued that
*33 the defendant was dissuaded from attempting to put [the criminal record] evidence before the jury because the prosecutor misled the defense by representing that the alleged victim did not have a record and in any event that the issue wouldn’t be argued in closing. The withholding of information with the intent to mislead and prejudice the defendant, and the exploitation of that misdirection in closing argument violated the defendant’s rights to a fair trial.
McCambridge cited Brady and Commonwealth v. Tucceri, 412 Mass. 401, 589 N.E.2d 1216 (1992), a Massachusetts case on failure to produce exculpatory evidence, as support. The Commonwealth responded that “any failure to produce the victim’s criminal record did not prejudice the defendant.” The SJC, without opinion, denied further appellate review. Commonwealth v. McCambridge, 427 Mass. 1103, 707 N.E.2d 1076 (1998).
III.
In January 1999, McCambridge filed a petition for habeas corpus under 28 U.S.C. § 2254 (1994 & Supp. II 1996) in the District of Massachusetts. He argued that his detention is unconstitutional because the trial court erroneously admitted the seized clothing and gun into evidence in violation of both his Fourth and Fifth Amendment rights; that the trial court failed to instruct the jury on the necessity defense; and that the prosecutor improperly withheld exculpatory material, namely, Doyle’s conviction record. On the Commonwealth’s motion, the district court dismissed McCambridge’s first argument as to the seized clothing and gun, because it was essentially a Fourth Amendment claim that was not reviewable on habeas. McCambridge v. Hall, 68 F.Supp.2d 1, 4 (D.Mass.1999). The district court subsequently held that the gun charge error did not affect the manslaughter conviction, as “[t]he question put to the jury was not whether McCambridge used an unlawful device when defending himself, but rather whether he used excessive force.” McCambridge v. Hall, 94 F.Supp.2d 146, 154 (D.Mass.2000).
The district court also held that McCam-bridge had procedurally defaulted on his claim that the prosecutor’s failure to disclose Doyle’s conviction record violated McCambridge’s rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). McCambridge, 94 F.Supp.2d at 154-55. The district court referred to the Massachusetts Appeals Court holding cited above, noting that “[pjrocedural default acts as an independent and adequate state ground to uphold the conviction.” Id. at 155. The court further held that McCambridge had not shown that “some objective factor external to the defense impeded defense counsel’s efforts to comply with the state’s procedural rule,” id. at 155-56, nor had he shown “actual prejudice” from the prosecution’s failure to produce the criminal conviction, id. at 156, nor any miscarriage of justice, id. The court reasoned:
The actual contents of Doyle’s criminal record are not relevant to this analysis because the details of the actual criminal record were not known to McCambridge at the time of the homicide.... Rather, McCambridge believed, from whatever source, that Doyle had a criminal history of child abuse, knew that accusations of child abuse were likely to provoke violence from Doyle, and after such provocation became fearful of his life when Doyle drew a gun. To these facts McCambridge testified at his trial, and the jury must have accepted that his provocation story at least raised some reasonable doubt in order to convict on *34 manslaughter rather than first- or second-degree murder.

Id.

The district court declined to issue a certificate of appealability. This court subsequently issued a certificate of appeal-ability on McCambridge’s Brady claim. On appeal, a panel of this court reversed the district court and granted the habeas petition. McCambridge v. Hall, No. 00-1621, slip op., 2001 WL 1097770 (1st Cir. Sept. 24, 2001). The panel held that the state court’s determination that McCam-bridge’s counsel should have objected at trial to the failure of the court to order the prosecutor to produce the record and to mark it into evidence was contrary to clearly established federal law, and its conclusion that McCambridge suffered no prejudice was an unreasonable application of the law to the facts. The panel held that, under clearly established federal law, a defendant may rely on a prosecutor’s representations that she has fully complied with her Brady disclosure requirements, and therefore, need not object. Id. at 17-18. Further, the panel held that the prosecutor’s insinuation in his closing that McCambridge had invented the entire story about Doyle’s criminal conviction prejudiced McCambridge and “may well have tipped the balance in favor of a manslaughter conviction.” Id. at 38.
IV.
A habeas petitioner must meet certain preliminary criteria before we can reach the merits of his claim. He must have fairly presented his claims to the state courts and must have exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). Further, if the state decision rests on the adequate and independent state ground of procedural default, then federal habeas review is unavailable absent a showing of cause and prejudice, or a showing that a miscarriage of justice will otherwise result. Strickler v. Greene, 527 U.S. 263, 282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Gunter v. Maloney, 291 F.3d 74, 78 (1st Cir.2002); Burks v. Dubois, 55 F.3d 712, 716 (1st Cir.1995).
The district court here held that the state court decided that McCambridge had procedurally defaulted the claim he now makes, and that finding of procedural default constitutes an adequate and independent state ground. McCambridge, 94 F.Supp.2d at 155. The district court held that McCambridge had shown neither cause nor prejudice. Id. at 155-56. The district court also agreed with the Appeals Court’s alternate holding, that even if the prosecution should have produced the record, there was no prejudice to McCam-bridge. Id. at 156.
Some members of the majority agree with each of the district court’s holdings. All members of the majority agree on the district court’s no-prejudice holding, and so, without discussion or elaboration of the procedural default argument, we address the issue of whether the state court’s conclusion that McCambridge was not prejudiced was an unreasonable application of the law.
Under the standard established in the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, § 104, 110 Stat. 1214, 1219 (1996), a federal court may not issue a habeas petition “with respect to any claim that was adjudicated on the merits in State court proceedings” unless the state court decision: 1) “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or 2) “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d) (Supp. II 1996). A state court’s *35 findings on factual issues “shall be presumed to be correct” and the petitioner bears the burden of disproving factual findings by “clear and convincing evidence.” 28 U.S.C. § 2254(e)(1).

A. Applicability of § 2254

We first deal with, and reject, the argument of amicus that we must review the prejudice issue de novo, rather than look to whether the state court’s determination is unreasonable. The Federal Defender’s Office[5] asserts that the Massachusetts state court analyzed McCambridge’s Brady claim solely under a Massachusetts state standard and therefore his federal claim was never “adjudicated on the merits” within the meaning of § 2254. If that were so, we would review McCambridge’s Brady claim de novo, rather than asking whether the state court’s holding is “contrary to, or ... an unreasonable application of, clearly established Federal law,” the standard required by § 2254. See DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir.2001), cert. denied, — U.S.—, 122 S.Ct. 1622, 152 L.Ed.2d 634 (2002); Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir.2001), cert. denied, — U.S. —, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).
It is true that the relevant portion of the Massachusetts Appeals Court decision cites only to a state court decision, Tucceri, 412 Mass. 401, 589 N.E.2d 1216. The state court inquiry did focus on whether there was “prejudice” to the defendant, which is the relevant federal standard. See Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936. But the Federal Defender’s Office argues that Tucceri established a standard for prejudice that is different from the federal standard, and the citation to Tuc-ceri indicates that the court was not using the federal standard to determine prejudice.
Tucceri states explicitly that it is articulating a state law standard that is “more favorable to defendants than the Federal Constitutional standard.” 589 N.E.2d at 1223 n. 11. There is no dispute that this is so. If the conviction survives this more lenient state standard, then, absent exceptional circumstances, it follows that the conviction would survive the federal standard, and we see no reason the state courts would be required to say explicitly that both standards are met. If there is a federal or state case that explicitly says that the state adheres to a standard that is more favorable to defendants than the federal standard (and it is correct in its characterization of the law), we will presume the federal law adjudication to be subsumed within the state law adjudication. Cf. DiBenedetto, 272 F.3d at 6 (stating that de novo review applies when “the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues)”). Therefore, we reject amicus’s argument that de novo review under Fortini applies here, and we apply § 2254’s standard to the state appeals court’s determination that McCambridge was not prejudiced by the prosecution’s failure to disclose the conviction record.

B. Standard of Review under § 2254

We turn to whether the state court holding that there was no prejudice “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).
There is no argument that the state court decision is “contrary to” clearly es *36 tablished federal law. The Supreme Court has stated:
Under the “contrary to” clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.
Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O’Connor, J.). Here, the state court applied the proper rule of law by asking if the defendant was prejudiced, see Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936, and there is no Supreme Court case involving “materially indistinguishable facts” that is contrary to the outcome here. Rather, the debate centers on whether the state appeals court determination was an “unreasonable application” of the federal rule on prejudice to the facts of the case here.
Williams made it clear that “[u]nder the ‘unreasonable application’ clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Williams, 529 U.S. at 413, 120 S.Ct. 1495 (O’Connor, J.). The Supreme Court further clarified that unreasonableness must be an objective standard, id. at 410, 120 S.Ct. 1495, and that an erroneous or incorrect application is not necessarily an unreasonable application, id. at 411,120 S.Ct. 1495.
Some possible readings of “unreasonable application” are too severe: Williams indicates that the test is not whether it is possible that a competent court could have reached the same conclusion. See Hertz & Liebman, Federal Habeas Corpus Practice and Procedure, § 32.3, 1449 (4th ed.2001) (noting that the Supreme Court in Williams found state supreme court decision to be an “unreasonable application” despite the fact that other courts had reached the same conclusion); see also Valdez v. Ward, 219 F.3d 1222, 1229-30 (10th Cir.2000), cert. denied, 532 U.S. 979, 121 S.Ct. 1618, 149 L.Ed.2d 481 (2001) (“[T]he fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court decision ‘reasonable.’ ”).
Some possible readings are too lenient: the mere fact that there was some error or that the state decision was incorrect is not enough. Williams, 529 U.S. at 411, 120 S.Ct. 1495; Boss v. Pierce, 263 F.3d 734, 739 (7th Cir.2001), cert. denied, — U.S. —, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002); Cannon v. Gibson, 259 F.3d 1253, 1260 (10th Cir.2001), cert. denied, — U.S. —, 122 S.Ct. 1966, 152 L.Ed.2d 1026 (2002); Tucker v. Catoe, 221 F.3d 600, 605 (4th Cir.2000), cert. denied, 531 U.S. 1054, 121 S.Ct. 661, 148 L.Ed.2d 563 (2000); Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.2000). The range for what is an unreasonable application must fall somewhere between the two. Within that range, if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application. We agree with the Second Circuit that “some increment of incorrectness beyond error is required.” Francis S., 221 F.3d at 111. The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court. Id.
As Justice O’Connor noted in Williams, unreasonableness is “difficult to define,” 529 U.S. at 410, 120 S.Ct. 1495, but it is a concept federal judges apply in different contexts. “Reasonableness is a concept, not a constant.” United States v. Ocasio, 914 F.2d 330, 336 (1st Cir.1990). For ex *37 ample, the state court decision may be unreasonable if it is devoid of record support for its conclusions or is arbitrary. O’Brien v. Dubois, 145 F.3d 16, 25 (1st Cir.1998).
To the extent prior opinions by panels of this court state a standard inconsistent with that articulated here, they are overruled. Thus, the standard recited in Williams v. Matesanz, 230 F.3d 421, 424 (1st Cir.2000), and O’Brien v. Dubois, 145 F.3d 16, 25 (1st Cir.1998) — that “for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes” — must be read to conform to these teachings. In light of Williams v. Taylor, we think that the more stringent interpretation of § 2254 articulated in O’Brien and Williams v. Matesanz is not justified.

C. Prejudice Analysis

We apply this “unreasonable application” standard to the state appellate court’s determination that there was no prejudice to McCambridge from the failure of the prosecutor to have produced the victim’s record. The Massachusetts Appeals Court based its no prejudice finding on two independent reasons. There was no prejudice because 1) McCambridge was aware of the victim’s record and was prepared to offer such evidence at trial; and 2) “[b]y convicting the defendant of manslaughter, the jury obviously credited the defendant’s testimony that the struggle in the van was precipitated by the defendant’s remark about this offense to Doyle.” 690 N.E.2d at 475. While some on the en banc majority think the state appeals court’s first ground alone would be dispositive, we focus on the second ground, which all in the majority think clearly disposes of the petition.
Even assuming arguendo that the prosecutor should have turned over the conviction record, there is no prejudice under Brady and so no due process violation unless there is “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (plurality opinion). This has been referred to as the Brady prejudice or materiality standard; without it, there is no Brady violation. Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936.
The Supreme Court explained in Bagley that a “ ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” 473 U.S. at 682, 105 S.Ct. 3375; see also Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (“One ... show[s] a Brady violation by ... showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”); United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (“The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish ‘materiality’ in the constitutional sense.”); United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir.1993) (discussing materiality in the context of Brady claims). At the same time, prejudice under Brady should not be equated with a sufficiency of the evidence standard, Kyles, 514 U.S. at 434-35, 115 S.Ct. 1555, nor does it “mean that the reviewing court must be certain that a different result would obtain,” United States v. Dumas, 207 F.3d 11, 15 (1st Cir.2000).
Defendant and amicus argue that the only reasonable conclusion is that *38 MeCambridge was prejudiced sufficiently to warrant a new trial. They point to the prosecutor’s closing comments,[6] saying he implied that Doyle was not convicted, after the prosecutor had not produced the conviction record and represented to the court there was no such conviction. They argue that this was a close case on the evidence and ultimately hinged on McCambridge’s credibility, which they argue was deeply wounded by the prosecutor’s comment. As support for this, they say that Doyle’s blood alcohol level, subcutaneous bleeding, and the medical technician’s testimony that Doyle was still warm indicate that Doyle was shot shortly before the crash; that the blood and tissue samples on the passenger side door and windshield indicate that MeCam-bridge was in the passenger’s seat at the time of the crash; that there was a cocked gun with the safety off in the van; and that the boxes of ammunition in the car indicate that both guns belonged to Doyle. They also argue that the state appellate court’s reasoning that “by convicting the defendant of manslaughter, the jury obviously credited the defendant’s testimony that the struggle in the van was precipitated by the defendant’s remark about [the conviction] to Doyle,” 690 N.E.2d at 475, is arbitrary and unsupported by the record, because the jury convicted MeCambridge of driving offenses and therefore clearly did not credit his testimony as to how the fight began.
The Commonwealth responds that, given the evidence presented to the jury, it was not unreasonable for the Massachusetts Appeals Court to conclude that, even if MeCambridge had been able to corroborate his testimony with the conviction record and the prosecutor had not made his statement in closing, there was no “reasonable probability that ... the result of the proceeding would have been different.” Bagley, 473 U.S. at 682, 105 S.Ct. 3375. The result in this proceeding was that MeCambridge was acquitted of first degree murder and convicted of manslaughter, so the question is whether there is a reasonable probability that the manslaughter verdict would have been different.
To assess that question, we first turn to the state trial court’s extensive jury instructions, which we quote in relevant part below. The trial judge explained the Commonwealth’s burden to prove that MeCam-bridge did not act in self-defense:
The Commonwealth must prove ... that one or more of the three requirements of self-defense was absent from this case.
... [T]hose three requirements are first that the defendant must have reasonably believed that he was being attacked or was immediately about to be attacked and that he was in immediate danger of being killed or seriously injured.
Second, the defendant must have done everything that was reasonable under the circumstances to avoid physical combat before resorting to force and, third, that the defendant must have used no more force than was reasonably necessary in the circumstances to protect himself.
She also gave thorough instructions on how to differentiate manslaughter upon provocation from self-defense and the role of excessive force:
Manslaughter is an unlawful, intentional killing resulting from a sudden transport of the passions of fear, anger, *39 fright, nervous excitement or heat of blood when there is no time to deliberate and when such passion or heat of blood is produced by adequate or reasonable provocation and without malice or upon sudden combat it would have been likely to produce in an ordinary person an abnormal state of mind and actually did produce such a state of mind in the defendant.
... The first element the Commonwealth must prove beyond a reasonable doubt is that the defendant inflicted an injury upon Mr. Doyle from which Mr. Doyle died; second, that the defendant injured Mr. Doyle as a result of sudden combat or in the heat of passion or using excessive force in self-defense; and, third, that the homicide was committed unlawfully without legal excuse or justification.
The provocation sufficient to reduce an unlawful killing from murder to manslaughter is that provocation which would likely produce in the ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse a person’s capacity for reflection or restraint and actually did produce such a state of mind in the defendant.
Another factor or circumstance which mitigates or reduces murder to manslaughter is when a person kills using excessive force in self-defense.... Specifically, if the person initiated an assault against the defendant so that the defendant reasonably feared that he was in danger of being killed or suffering grievous bodily harm at the hands of Mr. Doyle, then the defendant has the initial right to use whatever means were reasonably necessary to avert the threatened harm. But, if the defendant used excessive force, that is, more force than was reasonable or proper under the circumstances of this case or the defendant, himself, became the attacker and the use of such force resulted in the death of his assailant, then that would constitute manslaughter.
After a few hours of deliberation, the jury asked for clarification on unlawful killing, malice aforethought, burden of proof, and reasonable doubt. The jury then asked for clarification on the definition of manslaughter. The judge re-read the manslaughter instructions that she had previously given.
Based on these instructions, the state appeals court reasonably concluded that the jury must have found that McCam-bridge was provoked in some way, resulting in a sudden heat of passion, leading to physical conflict.[7] That is what McCam-bridge himself said and the jury accepted his version. The only evidence presented at trial regarding any possible provocation for the altercation was McCambridge’s testimony that Doyle threatened him with the nine millimeter Smith & Wesson after McCambridge had called him a child abuser, and that a conflict ensued. Thus the jury accepted McCambridge’s story about Doyle’s anger at being called a child abuser. Nothing could be added to this by having the fact of the child neglect conviction established or admitted into evidence.
*40 The state court also reasonably concluded that the jury necessarily found that McCambridge, in his self defense, used at least excessive force against Doyle (or that McCambridge turned into the attacker). Neither the fact of Doyle’s conviction, nor the contested excerpt from the prosecutor’s closing argument, is material to whether McCambridge used excessive force.
The evidence overwhelmingly supports the jury’s conclusion. McCambridge shot Doyle twice, once in the face and once in the back. The fact that Doyle was shot in the back is itself evidence of excessive force. Before shooting the second shot, McCambridge had to cock the trigger of his gun again before firing. This was not an automatic weapon, and the trigger pull was very heavy. The forensic evidence was that Doyle had time to draw in at least a couple of breaths before the second shot, and McCambridge pulled back from an initial shooting distance of about six inches to a distance of about three feet for the second shot. There was also evidence that Doyle’s head had been struck with a billy club, and a billy club with his blood-type on it was found. Even by McCambridge’s account, the drunken Doyle was simultaneously attempting to drive the van down one of Boston’s busiest highways, and so could not have been free to fully engage in the altercation. McCambridge himself said he had had at least some success in pushing Doyle’s gun hand down and away, again supporting the conclusion that McCambridge used more force than was needed.
McCambridge makes an independent argument based on the other verdict. We reject McCambridge’s argument that because the jury convicted him of the motor vehicle charges, they necessarily rejected his testimony about the argument and how it developed, and so the conviction record would have made a difference. The Appeals Court could reasonably conclude, supported by the expert testimony, that the jury concluded that once McCam-bridge shot Doyle, he pushed Doyle toward the back of the van and attempted to drive from the passenger’s seat or the driver’s seat. Either act would suffice for the motor vehicle charges. See Commonwealth v. Ginnetti, 400 Mass. 181, 508 N.E.2d 603, 605 (1987) (holding that, under Massachusetts statute criminalizing operating a motor vehicle under the influence and reckless operation of a motor vehicle, “a person ... operates a motor vehicle by starting its engine or by making use of the power provided by its engine”). See generally J. Pearson, Annotation, What Constitutes Driving, Operating, or Being in Control of Motor Vehicle for Purposes of Driving While Intoxicated Statute or Ordinance, 93 A.L.R.3d 7, § 6(a) (2002) (citing cases interpreting “operating” to include manipulation of controls from passenger’s seat). The state trial judge’s instructions made it clear to the jury that an individual need not be seated in the driver’s seat in order to be “operating” a vehicle within the meaning of the law.[8] And there was evidence that McCambridge was in the driver’s seat and sat in that seat after it was soaked with Doyle’s blood.
The overall import of McCambridge’s argument as to prejudice is that the prose *41 cution’s closing ' went to McCambridge’s credibility, and that, in turn, impugned the verdict. For a number of reasons, we think that the state court’s conclusion that this did not impugn the verdict is not an unreasonable application of clearly established law.
What mattered for McCambridge’s defense was not the truth of the fact of conviction itself, but rather the fact that the two had argued based on McCam-bridge’s accusing Doyle of having abused a child, and the subsequent threat supposedly made by Doyle. McCambridge was allowed to testify as to this. McCambridge argues that the inevitable result was that he was discredited before the jury and even before his own attorney — he posits that his attorney emphasized manslaughter in his closing, rather than self defense, because of the appearance that McCam-bridge had lied about the conviction story.
We take the analysis in stages. First, under Massachusetts law, the conviction record would not normally have been admissible, even as corroborative evidence. See Commonwealth v. Todd, 408 Mass. 724, 563 N.E.2d 211, 214 (1990) (holding that exclusion of victim’s conviction record was not error in part because what was important for the defense was the defendant’s belief, not the fact of the convictions); Commonwealth v. Fontes, 396 Mass. 733, 488 N.E.2d 760, 762 (1986) (holding that defendant may introduce specific instances of victim’s violent conduct to support self-defense theory only if such instances are recent and known to defendant at the time of the homicide). Since the conviction was inadmissible, we are left with the prosecution’s statement at closing. To the extent that the prosecutor attempted to imply that McCambridge was lying about the existence of a conviction in his closing argument, an objection could have been made, but was not.[9]
Second, even if admissible, proof of the existence of the conviction was not material to the question of use of excessive force in self defense. As counsel for McCam-bridge had just said in his closing, there was no evidence one way or the other as to the conviction and this was not the point anyway. As the district court pointed out, an accusation of child abuse or molestation may be even more likely to provoke violent rage if it is baseless. Thus, as defense counsel suggested, it was the accusation of child abuse, whether true or not, which enraged Doyle.[10]
Third, the effect of the lack of evidence of a conviction and the prosecutor’s statement was minimal given the wealth of evidence supporting the conviction. The contested statement in the closing argument comprises only one short paragraph in a sixteen-page transcript. The judge instructed the jury that nothing in the closing argument was to be considered as *42 evidence. And there was other evidence, particularly physical evidence, that undercuts McCambridge’s credibility as to his assertion that he did no more than act properly to defend himself — the blood evidence indicating that Doyle was shot at least five minutes before the van flipped; the fact that no witness reported gun flashes, although at least one witness watched for two minutes before the crash; the fact that Doyle had been shot more than once and most likely was also hit over the head with the bloodied billy club, which McCambridge could not explain; the fact that the weapon was found in McCambridge’s clothes, apparently tucked in there after the shooting; the trooper’s testimony that the van’s driver smashed into the windshield and remained in the front area of the van; the evidence indicating that Doyle was thrown hard into the passenger side door and then out the bottom of that door, and was neither trapped in the driver’s seat nor thrown into the windshield; the blood on the seat of McCambridge’s jeans, most likely from the bloodied driver’s seat cushion; and the fact that Doyle was already gray-blue when the troopers first saw him. The physical evidence, notably the blood patterns, was simply inconsistent with McCambridge’s theory that the shootings occurred within thirty seconds. At most, the prosecutor’s, statement was another stab at the already damaged credibility of the defendant, who was most likely viewed as telling some, but not all, of the truth. Jurors need not believe everything a witness says, nor need they believe witnesses are not selective in recounting events. Daily life experience refutes any such belief. The physical evidence, too, might well cause a jury to disbelieve McCam-bridge’s convenient statement that he recalled everything up to the point he fired the first shot in self-defense, and recalled nothing after that. None of the arguments advanced by McCambridge “put[s] the whole case in such a different light as to undermine confidence in the verdict.” Kyles, 514 U.S. at 435, 115 S.Ct. 1555. Much less do these arguments lead us to conclude that the state court’s judgment that there was no due process violation was unreasonable.[11]
Comparing the facts here with other cases, it is not unreasonable to conclude the Brady materiality/prejudice standard is not met. In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the defendant also claimed self-defense, and objected to the prosecution’s failure to disclose the victim’s criminal record. Id. at 100-01, 96 S.Ct. 2392. The Court held that the non-disclosure “did not deprive [the defendant] of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment.” The Court noted approvingly the trial judge’s emphasis on the “incongruity” of a self-defense claim with “the evidence of [the victim’s] multiple wounds and [the defendant’s] unscathed condition”; the fact that the criminal record would not have contradicted any evidence offered by the prosecutor; and that the conviction record would be cumulative of evidence that the victim was armed with a knife at the time of the crime. Id. at 113-14, 96 S.Ct. 2392. Moreover, in Agurs, the trial court and appellate court had assumed the conviction record would be admissible, id. at 100-02 *43 & n. 3, 96 S.Ct. 2392, while in this case it was not.
In United States v. Dumas, this court considered a case in which the defendant claimed that he had been entrapped into a drug charge by his prison cellmate, and the prosecution failed to disclose evidence indicating that the cellmate had been put on suicide watch, and evidence that would corroborate the defendant’s testimony as to how long the two had shared a cell. 207 F.3d 11, 13-15 (1st Cir.2000). Although the defense hinged on the defendant’s credibility, we found that neither the corroborative nor the impeachment evidence was material for Brady purposes. Id. at 16-17.
This court’s decision in United States v. Udechukwu, 11 F.3d 1101 (1st Cir.1993), does not assist McCambridge, much less does it show that the state court’s decision was an unreasonable application of federal constitutional law. In Udechukwu, the government, over objection, withheld evidence about a known drug trafficker, evidence that was favorable to the defendant. In closing, the prosecution questioned the existence of the trafficker when the prosecution knew that he existed. Id. at 1102-OS. The court did not reach the question of whether there was reversible error in the government’s failure to disclose. Rather, the court found a fatal taint from the prosecutor’s “persistent theme in closing argument suggesting the nonexistence of this information — and even the opposite of what the government knew.” Id. at 1105. Here, in contrast, the prosecutor’s closing had one line on this point; it was far from a persistent theme in a closing comprising sixteen pages of transcript. Here, the underlying information was not admissible. Here, in contrast to Udechuk-wu, there was no objection made to the prosecution’s closing argument. And here it is far less clear that the failure involved government misconduct; rather, it was sloppiness. The prosecutor here had an incomplete report on which he relied. The prosecutor did not knowingly misrepresent to the jury. Udechukwu does not support McCambridge.
On habeas review, McCambridge faces a double hurdle — showing both that there is a reasonable probability that the jury would have reached a different conclusion if it had the conviction record or if the prosecutor had not made the statement in the closing, and that the state appeals court determination on this point was unreasonable. Given the evidence here, he cannot clear either hurdle.

Conclusion

The petition for writ of habeas corpus is denied.

. He testified that it also could have been caused by attempts to resuscitate Doyle, but none of the witnesses recalled any attempts at resuscitation.

. Prior to trial, McCambridge, proceeding pro se, had unsuccessfully requested Doyle’s “rap sheet” by means of a hand-written letter to the prosecutor.

. The now-withdrawn panel opinion of this court assumed that there had been a typographical error and that the transcript omitted the word "no” between "absolutely” and "evidence.” But the transcript sentence and the flow of the argument make perfect sense as stated. The prosecutor may well have meant that there was evidence of the conviction, or of the prior conversation, but no evidence of the alleged confrontation the night of Doyle's death. This was the transcript that the state court had and McCam-bridge's brief before the Massachusetts Appeals Court cited the passage as it appeared in the transcript, with no modifications. If there was an error in the transcript which worked against the defendant, under state law he should have sought to correct the transcript. Mass. R.App. Pro. 8(e). The first suggestion that a word was omitted from the transcript appears to be in the brief that the Commonwealth submitted before the panel of this court. Our holding here does not turn on whether or not the word “no” should have been included, and so we do not need to decide the point.

. The court reversed the firearms conviction, agreeing that the judge should have instructed the jury on a necessity defense.

. This court invited the Federal Defender's Office to file an amicus brief in support of McCambridge and we thank the Office for its assistance.

. For present purposes, we do not pass on the Commonwealth's arguments that MeCam-bridge never objected to the prosecution's closing argument, or raised this as an independent issue in the state appeals court, and so has waived the issue.

. Under our analysis, it matters not whether the jury thought this was manslaughter due to a heat of passion or to sudden combat. The defense did not differentiate (nor do the facts lend themselves to such differentiation) — the defense's essential argument was that McCambridge did kill Doyle but he did it in self-defense when Doyle reached for the gun during their altercation and McCambridge’s response was not excessive. This brings the excessive force question into play.

. The instructions were as follows:
A person operates a motor vehicle not only while doing all of the well-known and easily recognized things that drivers do as they travel along a street or highway but also in doing any acts which directly tend to set the vehicle in motion. The law is that a person is operating a motor vehicle when he manipulates a mechanical or electrical part of the vehicle like the gear shaft or ignition which alone or in sequence will set the motor vehicle in motion.

. The remedy at that point would have been an instruction to the jury to disregard the prosecutor's accusation. McCambridge’s counsel could have requested this remedy even without the conviction record, since the court had already indicated that the question was McCambridge’s state of mind. Of course, if the prosecutor had produced the conviction record as requested by McCam-bridge, he probably would not have ventured to accuse McCambridge of lying on this point, if that, contrary to how the trial transcript reads, is what he did.

. Indeed, the conviction, had it been available, might have undercut the defense, or at least it could be reasonably thought to do so. Doyle had been convicted of child neglect. Child neglect is shameful, but "child abuse,” the term used by McCambridge, is a worse accusation. A false and worse accusation against Doyle could well lead to the conclusion that McCambridge was picking a fight and so the shooting was premeditated.

. As discussed earlier, the closing argument transcript may be read as it is written, that the prosecutor said "There is absolutely evidence of that [conviction and earlier argument],” indicating that tire prosecutor was not accusing McCambridge of fabricating the conviction, but only of fabricating the self-defense story. If the transcript is read that way, we still conclude that the conviction record was immaterial.