Anthony **OLSZEWSKI, III,** Petitioner,

v.

Luis **SPENCER,** Respondent.

No. CIV.A. 01–12143NMG.

United States District Court,
D. Massachusetts.

March 30, 2005.

*Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998).

David J. Nathanson, Committee for Public Counsel Services, Boston, MA, for Anthony Olszewski, III, Plaintiff.

Cathryn A. Neaves, Attorney General's Office, Boston, MA, for Luis Spencer, Defendant.

## ORDER

GORTON, District Judge.

Presently before the Court is the petition of Anthony Olszewski, III for a writ of habeas corpus. On January 18, 2005, United States Magistrate Judge Dein entered a 60–page Report and Recommendation, stating that the petition should be denied. Both parties have now filed objections.

Petitioner's principal objection concerns the Magistrate Judge's resolution of his claim that the destruction of a statement of a potentially exculpatory witness, while the statement was in police possession, constituted a violation of due process. Specifically, he argues that the Magistrate Judge erred in applying to his claim a three-part test, based upon both *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Petitioner contends that the appropriate test contains only two parts, which are derived solely from the *Youngblood* opinion. Applying that test, he argues that the Magistrate Judge should have reached the issue of police bad faith and resolved it in his favor.

■ Notwithstanding petitioner's citations to authority from other circuits, the Magistrate Judge applied the proper First Circuit test, as set forth in *United States v. Femia,* 9 F.3d 990 (1st Cir.1993). The Court in *Femia* held:

> *Trombetta* and *Youngblood* together established a tripartite test to determine whether a defendant's due process rights have been infringed by law enforcement's failure to preserve evidence
> . . . .
>
> A defendant who seeks to suppress evidence . . . must show that the government, in failing to preserve the evidence, (1) acted in bad faith when it destroyed the evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable.

*Id.* at 993–94. Under that test, it was proper for the Magistrate Judge to resolve the issue by concluding that prongs two and three were not satisfied and declining to address the issue of police bad faith. Thus, petitioner's objection to the Magistrate Judge's resolution of his due process claim is unpersuasive and overruled.

This Court declines to address petitioner's other objections because they, and the underlying claims which the Magistrate Judge rejected, are adequately dealt with in the Report and Recommendation.

Likewise, the Court will not consider respondent's contention that the Magistrate Judge erred in reviewing *de novo* petitioner's due process claim. That argument is moot because, as fully explained in the Report and Recommendation, even applying a *de novo* standard of review (which is more favorable to petitioner), the petitioner's argument is without merit. Accordingly, this Court accepts and adopts the Magistrate Judge's Report and Recommendation and this petition for a writ of habeas corpus is **DISMISSED.**

**So ordered.**

## *REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS*

DEIN, United States Magistrate Judge.

## I. *INTRODUCTION*

The petitioner, Anthony Olszewski, III ("Olszewski" or the "defendant"), was convicted twice of first-degree murder by Hampden County Superior Court juries, and is presently serving a life sentence. Olszewski's first conviction was reversed by the Massachusetts Supreme Judicial Court in *Commonwealth v. Olszewski,* 401

Mass. 749, 519 N.E.2d 587 (1988) ("*Olszewski I* "). A second jury convicted the defendant again, and his conviction was affirmed by the SJC in *Commonwealth v. Olszewski,* 416 Mass. 707, 625 N.E.2d 529 (1993) ("*Olszewski II* "). By his Petition for Writ of Habeas Corpus (the "Petition"), Olszewski raises four claims: (1) that his due process rights were violated due to the deliberate destruction by police of an exculpatory alibi statement made by a witness; (2) that there was ineffective assistance of counsel in that trial counsel failed to explain the reason for his failure to call the defendant's father as a witness; (3) that he was deprived of a fair trial because, in his closing, the prosecutor made assertions he knew were false, relied on excluded evidence and injected his own personal feelings into the case; and (4) that he was deprived of his right to a trial by a jury of his selection when the trial judge excluded an impaneled juror based on *ex parte* communications with the juror. For the reasons detailed herein, this court recommends to the District Judge to whom the case is assigned that the Petition for Writ of Habeas Corpus be DENIED.

## II. STATEMENT OF FACTS [1]

### Procedural Background

Olszewski was indicted on March 2, 1982 by a Hampden County grand jury for the first-degree murder of his ex-girlfriend, JoAnne Welch. (SA Ex. 1 at 1). A jury trial began on January 12, 1983, Keady, J. presiding. (*Id.* at 6). On February 12, 1983 the jury returned a verdict, finding the defendant guilty of first degree murder on theories of deliberate premeditation and extreme atrocity and cruelty. (*Id.* at 6–7). Olszewski was sentenced to life imprisonment. (*Id.*). On direct appeal, the Massachusetts Supreme Judicial Court ("SJC") reversed and remanded the case due to the Commonwealth's loss of a number of potentially exculpatory items. *Olszewski I,* 401 Mass. at 758, 519 N.E.2d at 592. In so ruling, the SJC specifically addressed the destruction of a statement by an alibi witness, Philip Strong, which is relevant to the instant Petition. *Id.* An original, handwritten statement by Mr. Strong, who later changed his testimony, was destroyed under circumstances which will be described in more detail, *infra.* Mr. Strong's first statement had provided the defendant with an alibi, while in his second statement he contended the defendant had confessed to the crime. *Id.* at 752, 519 N.E.2d at 589. Mr. Strong's second statement was the only direct evidence of the defendant's guilt, the rest of the evidence being circumstantial. *Id.* at 755 & n. 4, 519 N.E.2d at 590–91 & n. 4. While finding that the original statement was both exculpatory and material, the SJC nevertheless found that the admission of Mr. Strong's testimony at trial was proper since "the defense counsel fully described to the jury the circumstances of the making and the destruction of Strong's first statement … [and] thoroughly cross-examined, and effectively impeached, Strong." *Id.* at 758, 519 N.E.2d at 592.

In reversing and remanding the case due to the loss of other evidence, the SJC ordered as follows:

---

1. The Record below is found in the Supplemental Answer (Docket Nos. 12a & 12b) filed by the Commonwealth, which will be cited as "SA Ex. ___." In addition, Olszewski filed a Memorandum and Appendix in support of his petition (Docket No. 23) which will be cited as "*Pet. Mem.*" and "A. ___." The underlying facts are not in dispute. *See Pet. Reply* (Docket No. 22) at 3. As the parties agree, the facts as found by the State court are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). *See also Coombs v. Maine,* 202 F.3d 14, 18 (1st Cir.2000).

On remand, the judge, on proper showing by defense counsel that the lost or destroyed evidence is potentially exculpatory, must undertake the weighing test set forth in [*Commonwealth v. Willie*, 400 Mass. 427, 432–433, 510 N.E.2d 258 (1987)]. For each piece of missing evidence shown to be potentially exculpatory, the judge must weigh the culpability of the Commonwealth and its agents, the materiality of the evidence, and the potential prejudice to the defendant.

*Id.*, at 757, 519 N.E.2d at 591–92. Thereafter, the trial judge (Moriarity, J.) undertook extensive hearings relating to the evidence which had been lost and destroyed. By the time of these hearings, some physical evidence, although not Mr. Strong's first statement, had been located. (A.61).

In connection with Mr. Strong's first statement, the defendant argued that its destruction required that the case against him be dismissed. The trial judge rejected this argument and concluded as follows:

Weighing the culpability of the police against the materiality of the evidence and the potential prejudice to the defendant resulting from its destruction, I do not believe that dismissal of the indictment is required or warranted. As was true at the first trial, defense counsel will have full opportunity to describe the circumstances of the making and destruction of the first statement and to thoroughly cross-examine both Strong and the police officers with regard to it. I am also prepared, if requested to do so, to instruct the jury that they may draw inferences adverse to the prosecution's case based on the destruction of the statement.

(A.157–58). The trial judge further rejected the defendant's alternative request that the Commonwealth be precluded from addressing the first statement in its case-in-chief, and that the defendant be allowed to bring it out on cross-examination. (A.158). Such an approach, according to the trial judge, might result in the jury inferring "that the Commonwealth tried to conceal that information from them" and "would be a further distortion of the truth-seeking process." (A.158–59).

The trial began on January 16, 1990, Moriarity, J. presiding. (SA Ex. 1 at 12). On February 5, 1990 the jury returned a verdict of guilty of first degree murder by reason of extreme atrocity or cruelty. (*Id.*). *See also Olszewski II*, 416 Mass. at 708, 625 N.E.2d at 532. The defendant was again sentenced to life imprisonment. (SA Ex. 1 at 12). Olszewski filed a timely motion for a new trial pursuant to Mass. R.Crim. P. 25, which was denied on November 30, 1990. (*See* SA Ex. 9 at 1–2). On December 30, 1993, after conducting a plenary review in accordance with Mass. Gen. Laws ch. 278, § 33E (which governs capital cases), the SJC affirmed the conviction. *Olszewski II.*[2] In his direct appeal, the defendant had raised the following issues relevant to the instant habeas petition: (1) that Philip Strong's testimony should have been excluded because of the destruction of his original handwritten statement, *Olszewski II* at 714, 625 N.E.2d at 535; (2) that his federal constitutional rights had been violated by the dismissal of an impaneled juror before testimony began based on *ex parte* communications with the trial judge, *id.* at 720, 625 N.E.2d at 538; (3) that the prosecutor had improperly commented upon the defendant's failure to call his father and sister as wit-

---

**2.** Further details regarding the defendant's post-trial claims will be addressed *infra* in connection with the government's claim that Olszewski's claim of ineffective assistance of counsel has been procedurally defaulted.

nesses, *id.* at 723, 625 N.E.2d at 540; and (4) that the prosecutor, in his closing, improperly personally vouched for Strong's truthfulness, mischaracterized the evidenced, referred to evidence which had been excluded, and wrongfully argued that the defendant's guilt could be inferred from his failure to express sympathy to the victim's family after her death. *Id.* at 725–26, 625 N.E.2d at 541.

Thereafter, Olszewski engaged in extensive post-trial proceedings, which culminated in the filing of his timely habeas petition on or about December 5, 2001. Of relevance to the instant matter, on January 11, 1995, the defendant filed a *pro se* motion for a new trial pursuant to Mass. R.Crim. P. 30, which was denied by the trial judge on the same day. (SA Ex. 5). Therein, Olszewski raised a claim of ineffective assistance of counsel on the part of trial counsel because he did "not bring forward witnesses for the defense who were ready and expected to be called (father, sister) . . ." and on the part of appellate counsel because he "failed to argue ineffectiveness on appeal." (*Id.*). On September 10, 1996 and December 23, 1996, the defendant filed *pro se* applications with the single justice of the SJC for leave to appeal the denial of his motion for a new trial, as well as for the appointment of counsel. (SA Exs. 12–13; Ex. 16 at 2). On February 28, 1997, a single justice of the SJC remanded the case on the issue of appointment of counsel (*see* SA Ex. 6 at Ex. B), and counsel eventually was appointed. (*See* SA Ex. 16 at 2). Meanwhile, on or about April 7, 1997, Olszewski had filed a *pro se* motion to amend his motion for a new trial. (SA Ex. 6). On May 24, 1999, appointed counsel sought to withdraw Olszewski's *pro se* motion for leave to appeal, but a single justice of the SJC denied the motion to withdraw, allowed counsel to supplement the petition for leave to appeal, and ordered that the defendant's "gatekeeper" petition remain pending. (SA Ex. 16 at 2–3).

On or about August 30, 1999, Olszewski, through counsel, filed a "Motion to Make Amendments to Defendant's Motion for a New Trial." (SA Ex. 7). Olszewski's *pro se* motion (SA Ex. 6) and his counsel's supplement (SA Ex. 7) raised a number of issues, including, for the first time, whether there was ineffective assistance of counsel because trial counsel had failed to notify the court that the reason the defendant's father was not called as a witness was because he was "unnecessarily hostile, volatile and damaging to the defendant's case." (SA Ex.7 at 37). Treating these motions as a "second motion for new trial," the trial court denied the motions on June 12, 2000, without a hearing "as the defendant has waived each of the issues presented." (SA Ex. 9). Olszewski's motion to reconsider this ruling was also denied. (SA Ex. 11).

On December 27, 2000, Olszewski, through counsel, filed a "Petition for Leave to Appeal" the denial of his various post-trial motions with the SJC. (SA Ex. 14). Therein, Olszewski challenged, *inter alia,* trial and appellate counsel's handling of the decision not to call the defendant's father as a witness. (*See* SA Ex. 16). A single justice of the SJC denied the petition for leave to appeal to the full bench, concluding that "the claims were either waived or fall short of the 'new and substantial' requirement set forth in G.L. c. 278, § 33E[.]" (*Id.*). This timely habeas petition followed.

*Facts Relating To The Underlying Crime*

The following facts, as taken from *Olszewski II,* are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1).

Olszewski and the victim, JoAnne Welch, had dated for about two years be-

fore her murder on the night of January 28, 1982. *Olszewski II,* 416 Mass. at 709, 625 N.E.2d at 532. The relationship had ended early in January, and the victim had begun dating another man, which upset the defendant. *Id.* On the night of the murder, Olszewski, in the presence of several of his friends, had threatened to kill the victim. *Id.*

On the day of her murder, the victim had told family members and co-workers that she was going to go to the defendant's house after work to retrieve some items and money she had loaned him, and then return home. *Id.* While she did stop by the defendant's home, she never returned to her home. *Id.* The SJC noted that while there was testimony at trial that the victim had been seen on January 28, 1982 at approximately 8 p.m. alone and alive, these witnesses were effectively impeached by the prosecution. *Id.* at n. 1.

On January 29, 1982, the victim's severely beaten, frozen body was found, as was some clothing, jewelry and teeth at various locations. *Id.* at 709–710, 625 N.E.2d at 532–33. The victim's car was found on January 30, 1982, along with bloodstains, hairs and fibers belonging to the victim. *Id.* at 710, 625 N.E.2d at 533.

The defendant did not testify at his second trial, but a police officer testified as to a statement given by the defendant describing his activities during the evening of January 28th. *Id.* at n. 2. His defense was that he had an alibi. The relevant facts, as described by the SJC, are as follows:

> The defendant admitted that the victim came to his house on January 28 to pick up her belongings, but maintained that she had left around 6:30 P.M. He told the police that he was in the company of Philip Strong between 7 and 9 P.M. He met other friends around 9 P.M., spending the remainder of the evening in a bar with one of them before returning home.

> Several of his acquaintances testified to seeing him at various times during the evening of January 28. Strong initially corroborated the defendant's account of his activities between 7 and 9 P.M., the crucial period in the view of the Commonwealth. Some two weeks later, on February 15, Strong changed his story and provided the police with a statement that became the centerpiece of the Commonwealth's case against the defendant. Strong told the police that he had not been with the defendant on January 28, but had been with the defendant on January 29, on which occasion the defendant confessed to murdering the victim. Strong testified that the defendant stated that he had choked the victim with his hands, wrapped a belt around her neck and dragged her from her automobile, stamped on her neck with the heel of his shoe, then run her over several times with the vehicle. When she became stuck underneath the automobile, he pulled her out, threw her in the back seat, and drove to Westfield, where he threw her out of the automobile. The defendant then drove the automobile to a parking lot adjacent to a bowling alley in Westfield, where he abandoned it. From a gasoline station across the street, the defendant called his father, who picked him up and drove him home.

*Id.* at 710–11, 625 N.E.2d at 533.

> The Commonwealth also presented evidence that on January 29, before the victim's body was found, the defendant called a friend to tell him he had been "only kidding" when he had said that he would kill the victim. *Id.* at 711, 625 N.E.2d at 533. In addition, another friend of the defendant's testified that, about two weeks after the murder, the friend asked him

"Why did you do it?" and the defendant just left without replying. *Id.*

Virtually all of the physical evidence had been lost or destroyed prior to the first trial. *Id.* at 712, 625 N.E.2d at 534. Some of it was found after reversal of the defendant's first conviction, but before substantive proceedings had begun on remand on the issue of the appropriate remedy for its loss or destruction. *Id.* When the physical evidence was recovered, "all of the evidence was examined exhaustively by experts for both parties. Although no physical evidence was discovered that linked the defendant to [the sites in question], no evidence was discovered suggesting the presence of a third party, or the involvement in the murder of any vehicle other than the victim's white automobile." *Id.* at 715, 625 N.E.2d at 535.

### Destruction of Strong's First Statement

As noted above, following the reversal of the defendant's first conviction, the trial judge undertook extensive hearings relating to the evidence which had been lost and destroyed. (*See* A. 60). With respect to the destruction of Strong's first statement, the trial judge made the following findings, which were accepted by the SJC. *See Olszewski II,* 416 Mass. at 713, 625 N.E.2d at 534.

Philip Strong was interviewed at the West Springfield police station by Detectives Zielinski and Lenahan on February 1. He told them that on January 28 he had been driving around in his own car at about 7:00 P.M. when he saw the defendant in his car, parked by the old Y.M.C.A. on Upper Church Street. He said he pulled his car alongside the defendant's car, that the two talked for about an hour and a half, and that JoAnne Welch was not mentioned at all in the course of the conversation. He said the defendant left shortly before 9:00 P.M. and that he did not see him for the rest of the evening. He wrote his statement out in his own handwriting and left it with the police. The written statement was given to Captain Sypek. It was all contained on a single sheet of paper.

(A.77). The SJC found that this first statement was "material and exculpatory" and that it "had value as impeachment material." *Olszewski II,* 416 Mass. at 716–17, 625 N.E.2d at 536 (citing *Olszewski I,* 401 Mass. at 758, 519 N.E.2d at 592).

The facts relating to the destruction of this statement as found by the trial judge were as follows:

At sometime during the early afternoon of February 15, 1982 Captain Sypek sent Detective Zielinski to pick up Philip Strong and bring him to the police station. When Zielinski arrived at the station with Strong he brought him to a conference room where Captain Sypek was waiting for him. Sypek had the one page statement that Strong had given to Detective Lenahan and Zielinski on February 1 on the table in front of him. Captain Sypek began questioning Strong about his statement. He and Detective Zielinski both made it clear that they did not believe that Strong had been with the defendant at the time and place mentioned in that statement. Strong at first insisted that his statement was accurate, but as the questioning continued he began to waiver. He told the officers that he'd like to be left alone so Sypek and Zielinski left the room, leaving the statement on the conference table. While they were out of the room Strong removed that statement from the folder in which it had been left and destroyed it. He ripped it up and threw the pieces into a wastebasket. When the officers returned to the room a few minutes later he told them

that his first statement had been false, but that he was prepared to give them a new and accurate statement.

(A.84–85). The second statement was very different from the first. In his second statement, Strong asserted that Olszewski had confessed to killing Welch, and had provided extensive details about the crime as well as about his motive in killing her. (A.85–88). He further claimed to have gone to the scene with the defendant. (A.87–88).

With respect to the destruction of the first statement, the trial judge concluded as follows:

I do not believe that Captain Sypek and Detective Zielinski were so obtuse that they did not realize that the first statement had been destroyed until after Strong had given his second statement and left the station and until after the wastepaper basket in the conference room had been emptied. On the contrary, I strongly suspect that they deliberately left the statement on the conference room table and left the room in the hope that Strong would destroy the statement and give a new one.

By the time the officers left the room, Strong was a very disturbed young man who devoutly wished that he had never given the first statement and that he could have it back. He was probably by then aware that if his first statement should be proved false he would be subject to possible prosecution as an accessory after the fact to murder. The officers gave him an opportunity to undo what he had done and he took advantage of it. Once the first statement was destroyed I do not believe they made any attempt to retrieve it.

What Captain Sypek and Detective Zielinski did was incredibly foolish but I do not believe it was done maliciously. They both sincerely believed that the first statement was false and wanted very much to have it corrected. I do not believe it ever occurred to either one of them that the first statement should be preserved for the purpose of providing the defendant with an impeachment tool. Although their degree of culpability was greater than negligence, it did not amount to a bad faith effort to deprive the defendant of exculpatory evidence.

(A.156–58).

On appeal from his second conviction, the "defendant argue[d] vehemently that the finding of no bad faith cannot be reconciled with the subsidiary facts found by the judge and that the only logical conclusion to be drawn from the police officers' actions is that they intentionally destroyed evidence favorable to the defendant to strengthen (or perhaps even to manufacture) their case against him." *Olszewski II*, 416 Mass. at 716, n. 8, 625 N.E.2d at 536, n. 8. The SJC rejected both this factual argument as well as the defendant's contention that the safeguards imposed by the trial judge, including extensive cross-examination and a curative jury instruction that the jury could infer that the destroyed statement contained material unfavorable to the Commonwealth "did not sufficiently punish the Commonwealth for the acts of its agents." *Id.* at 716 & n. 8, 625 N.E.2d at 536 & n. 8.

Additional facts will be provided in connection with the defendant's specific claims.

## III. DISCUSSION

### A. Standard of Review—Habeas Petition—Generally

The standard of review to be applied to Olszewski's habeas corpus petition is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under

this standard, a federal habeas court may not grant a writ of habeas corpus unless the underlying state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As the United States Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts .... The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). An "unreasonable application is different from an incorrect one." *Id.* In order to reach the level of "unreasonable," "some increment of incorrectness beyond error is required." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir.2002) (en banc) (internal citation and quotation omitted). This increment "need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *Id.* Thus, a habeas petitioner "must do more than merely identify an incorrect result." *Jackson v. Coalter*, 337 F.3d 74, 81 (1st Cir.2003). In short, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529

U.S. 362, 411, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000).

Additional relevant principles governing the applicable standards of review will be addressed in connection with specific claims.

**B.** *The Destruction of Strong's Statement*

Olszewski's principle claim is that his due process rights were violated by the police officers' involvement in the destruction of Strong's first statement. While this court agrees with the defendant that the issue is subject to a *de novo* review, this court concludes that Olszewski has failed to establish that his constitutional rights were violated.

**1.** *Standard of Review*

The parties disagree as to the appropriate standard of review to be applied to this claim. The Commonwealth contends that the state law regarding the destruction of evidence is more favorable to the defendant, and therefore incorporates the federal standard. *Resp. Opp.* (Docket No. 19) at 19 n. 6. Olszewski, however, argues that he is entitled to a *de novo* review of his destruction of evidence claim. *See Pet. Reply* (Docket No. 22) at 3. While in this court's view the outcome remains the same regardless of the standard applied, the standard does affect the analysis. Consequently, this issue will be addressed. For the reasons detailed herein, this court concludes that a *de novo* review is appropriate in the instant case.

It is well established that where a federal claim was never addressed by the state courts, but, rather, the state court decided an issue solely on state law grounds, the state court's decision is not entitled to the deferential review defined in the AEDPA. Instead, the federal claim

is entitled to a *de novo* review. *See Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001); *DiBenedetto v. Hall*, 272 F.3d 1, 6–7 (1st Cir.2001). The exception to this rule, which the government contends applies here, is where the state law standard is "more favorable to defendants than the Federal Constitutional standard." *McCambridge v. Hall*, 303 F.3d at 35 (internal quotation omitted). Under such circumstances, "[i]f the conviction survives this more lenient state standard, then, absent exceptional circumstances, it follows that the conviction would survive the federal standard . . . ." *Id.* Thus, "[i]f there is a federal or state case that explicitly says that the state adheres to a standard that is more favorable to defendants than the federal standard (and it is correct in its characterization of the law), [the federal court] will presume the federal law adjudication to be subsumed within the state law adjudication." *Id.*

In the instant case, it is undisputed that the state courts addressed the defendant's claim only in terms of state law. In *Olszewski I*, the SJC remanded the case for purposes of "undertaking the weighing test" set forth in *Commonwealth v. Willie*, 400 Mass. 427, 432–33, 510 N.E.2d 258 (1987). *Olszewski I*, 401 Mass. at 757, 519 N.E.2d at 591–92. On remand, the trial judge applied the *Willie* test and the SJC reviewed the lower court's application of that standard. *Olszewski II*, 416 Mass. at 716–17, 625 N.E.2d at 536. There was no reference by the SJC to any federal law or any federal constitutional principles. *Id.*

Consequently, under well-established principles there would be no deference to the state court's decision, and the federal claim would be entitled to a *de novo* review.

■ The government argues, however, that the state standard is more favorable to the defendant than its federal counterpart. This court disagrees. Rather, the two standards are simply different—one is no more favorable to the defendant than the other.

As the *Willie* court held:

In this Commonwealth, when potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant.

*Commonwealth v. Willie*, 400 Mass. at 432, 510 N.E.2d at 261.

[This] test does not require the Commonwealth to prove good faith or earnest efforts to preserve the evidence. The Commonwealth's conduct is merely a factor to be weighed in determining its culpability. That culpability, if any, is then weighed along with the other two factors, materiality and prejudice, in determining whether, and to what extent, any remedy will be employed.

*Id.* at 432–33, 510 N.E.2d at 262.[3]

The federal law relating to the destruction of evidence does not apply the same

---

**3.** The SJC applied the *Willie* balancing test and found that while Strong's first statement was material, exculpatory and had value as impeachment material, "because the general contents of the destroyed statement were known, and defense counsel was permitted to cross-examine fully concerning its making and destruction, its loss did not seriously impair the defense." *Olszewski II*, 416 Mass. at 716–17, 625 N.E.2d at 536 (additional Massachusetts case citations omitted). Consistent with the *Willie* standard, the SJC noted, but did not find the good or bad faith of the Commonwealth in destroying the evidence to be controlling. *Id.* at 716 n. 8, 625 N.E.2d at 536 n. 8 (SJC rejects in a footnote defendant's argument that the trial court's "finding of no

balancing test as *Willie*, and the government's motive is controlling provided, as detailed below, that the evidence rises to the level of constitutional materiality. As the First Circuit held in the *United States v. Femia*, 9 F.3d 990, 993–94 (1st Cir. 1993), analyzing the controlling Supreme Court cases of *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988):

> A defendant who seeks to suppress evidence formerly in the government's possession ... "must show that the government, in failing to preserve the evidence, (1) acted in bad faith when it destroyed the evidence, which (2) possessed an apparent exculpatory value, and which (3) is to some extent irreplaceable. *Thus in missing evidence cases, the presence or absence of good or bad faith by the government will be dispositive.*"

(Emphasis added). *See also Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 1202, 157 L.Ed.2d 1060 (2004) (where the State fails "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," there is no due process violation "unless a criminal defendant can show bad faith on the part of the police") (quoting *Youngblood*, 488 U.S. at 57–58, 109 S.Ct. at 337).

The defendant argues that "the Massachusetts rule's consideration of the subjective intent of the police is different from *Youngblood*" and that the "tests are not easily equated." *Pet. Reply* at 5, 6. This court agrees. In fact, the Massachusetts

state standard has been characterized by different courts as being "more favorable to [a defendant] than the federal test established in *Youngblood* and *Trombetta*," *Otsuki v. Dubois*, 994 F.Supp. 47, 56 (D.Mass.1998), and "stricter than that stated in the *Youngblood* opinion." *Commonwealth v. Henderson*, 411 Mass. 309, 311, 582 N.E.2d 496, 497 (1991).

In light of the differences between the state and federal standards, this court concludes that a *de novo* review is appropriate. This appears to be the approach taken in *DiBenedetto v. Hall*, where the court held that because the SJC had decided this issue on state law grounds (applying *Willie*), a *de novo* review was appropriate. 272 F.3d at 6–7. In conducting its *de novo* review, the court applied "clearly established federal law," as set forth in *Youngblood* and *Trombetta*. *Id.* at 12. The same approach should be taken here.

### 2. The Destruction of the First Statement Did Not Result in a Violation of the Defendant's Constitutional Rights

The defendant argues that "the *facts* adopted by the SJC compel a ruling that the government-engineered destruction of Strong's statement and admission of his subsequent testimony violated Olszewski's right to due process." *Pet. Mem.* (Docket No. 23) at 25. Thus, according to Olszewski, the facts surrounding the destruction of Strong's first statement [4] establish a "deliberate and calculated effort to deprive Olszewski of plainly exculpatory evidence." *Id.* at 35. Moreover, the defendant contends that allowing the government to address the destruction of the statement in

---

bad faith cannot be reconciled with the subsidiary facts found by the judge....").

**4.** A detailed analysis of the facts on which the defendant relies can be found in *Pet. Mem.* at

27–35 and elsewhere throughout his pleadings. The defendant agrees with the SJC's description of the facts, but adds more details.

its case in chief, primarily to "establish Olszewski's alleged consciousness of guilt in procuring an allegedly false alibi," resulted in a situation where the government corroborated its case "using evidence that its own agents destroyed" which was "inherently unfair." *Id.* at 35–36. Finally, the defendant argues that Strong's statement was irreplaceable given the facts of the case, and that the safeguards allowed by the trial court were insufficient. According to the defendant, "the police destruction of Strong's statement deprived Olszewski of substantive (not impeachment) information that independently corroborated Olszewski's alibi." *Pet. Reply* at 11. The defendant contends that one of three possible remedies should have been allowed—"dismissal of the indictment, suppression of Strong's testimony, or prohibiting the Commonwealth from eliciting the destruction on direct and blunting the value of the impeachment." *Pet. Mem.* at 36–37.

■ This court concludes that the defendant has failed to establish a violation of his constitutional rights. Despite careful analysis of the defendant's argument, this court concludes that Strong's first statement was not irreplaceable, and the defendant was not deprived of the opportunity "to prove in front of the jury facts tending to demonstrate his innocence." *Pet. Reply* at 12. This court agrees with the SJC that "because the general contents of the destroyed statement were known, and defense counsel was permitted to cross-examine fully concerning its making and destruction, its loss did not seriously impair the defense." *Olszewski II,* 416 Mass. at 717, 625 N.E.2d at 536. This fact is fatal to the defendant's claim of a constitutional violation.

Applying the federal *Trombetta/Youngblood* analysis to the instant case, it is undisputed that Strong's first statement was material and exculpatory. *Id.* at 716, 625 N.E.2d at 536. Moreover, regardless whether, as the trial judge found, the police did not think about the value of the contents of the document before consciously allowing it to be destroyed,[5] or, as defendant argues, they plotted to have the first statement destroyed to strengthen their case against Olszewski, the exculpatory value of the document "was apparent before the evidence was destroyed." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. It is also clear that the way the situation was handled, for example leaving Strong alone with his original statement and having the police physically write the second statement, was inconsistent with established police procedures. *Pet. Mem.* at 28–30. Nevertheless, to satisfy the "standard of constitutional materiality . . . evidence must *both* possess an exculpatory value that was apparent before the evidence was destroyed, *and* be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534 (emphasis added). The defendant cannot satisfy the second prong of this analysis.

Olszewski argues, strenuously, that the state courts erred in concluding that the police did not act in bad faith. For present purposes, that issue does not have to be decided. *See DiBenedetto v. Hall,* 272 F.3d at 12–13 (court "need not decide" whether prosecution's conduct in destroying evidence meets the *Youngblood* "bad faith" standard since defendant fails to establish that he "would be unable to obtain comparable evidence by other reasonably available means"). Consequently, this court will assume, *arguendo,* that for

___

5. *See Olszewski II,* 416 Mass. at 715–16 & n. 8, 625 N.E.2d at 536 & n. 8.

federal constitutional purposes the intentional destruction of apparently exculpatory evidence may be sufficient to satisfy the "bad faith" requirement of the analysis, regardless of the actual motives or intentions of the police. *See United States v. Femia*, 9 F.3d at 995–96 (trial judge "presumably would have found the destruction to have been in bad faith" "if the exculpatory value was apparent before the destruction of the tapes"); *Youngblood*, 488 U.S. at 56 n. *, 109 S.Ct. 333 ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."). *But see United States v. Elliott*, 83 F.Supp.2d 637, 644–48 (E.D.Va. 1999) (in addition to fact that police should have recognized the obvious exculpatory value of destroyed glassware, court makes an additional inquiry to determine if "there is a showing of objective bad faith sufficient to establish the bad faith requirement of the *Trombetta/Youngblood* test."). Here, the content of the destroyed document can be recreated, at least substantially, through the examination of witnesses, and the circumstances of its destruction were fully explored at trial. This "reasonable—if not wholly satisfactory—alternative" provided sufficiently comparable evidence to satisfy the defendant's constitutional rights. *See United States v. Mannarino*, 850 F.Supp. 57, 72–73 (D.Mass.1994) (where witness statement destroyed in violation of Jencks Act, court looks at *Trombetta* consideration of ability to "obtain comparable evidence by reasonably available means" in order to fashion remedy; court refused to dismiss case but allows deposition of the witness and police officers who took statement). *See also DiBenedetto v. Hall*, 272 F.3d at 12–13 (sneaker with blood spot destroyed; no constitutional violation where test results existed and defendant free to cross-examine expert who conducted test).

The cases relied on by the defendant do not require a different result and are factually distinguishable from the instant case. In those cases, there clearly were no alternative sources of information. For example, in *United States v. Bohl*, 25 F.3d 904, 913–14 (10th Cir.1994), a conviction was dismissed on a charge of using nonconforming steel in the fabrication of radio transmission towers for the FAA, where the steel samples were destroyed and the only available "substitute evidence" were photos, minimal samples which were too small to test, and the government's test results, which were based on challenged methodologies. In *United States v. Cooper*, 983 F.2d 928 (9th Cir.1993), equipment which was allegedly used to manufacture methamphetamine was destroyed. The defendants had argued continuously that they ran a legitimate laboratory, and that the equipment did not have the capacity to make the illegal drugs. The court ruled that general descriptions and photographs of the equipment, which would not provide the needed detail to address the legitimate, technical defense raised by the defendants, was not an "adequate substitute for the laboratory equipment." *Id.* at 932. In *United States v. Elliott*, 83 F.Supp.2d at 643–44, glassware was fingerprinted and destroyed, leaving the defendant without any way to establish whether the glassware with his fingerprints contained a chemical residue to support the charge of conspiracy to possess, manufacture and distribute methamphetamine. In *United States v. Belcher*, 762 F.Supp. 666, 672 (W.D.Va.1991), the defendant was charged with manufacturing marijuana, but the government destroyed the alleged marijuana without testing it, making it "clear" that the defendant "could not secure 'comparable evidence by

other reasonably available means.'" Finally, in *United States v. Pollock*, 417 F.Supp. 1332 (D.Mass.1976), decided before *Youngblood* and *Trombetta,* the defendant's principal defense to a drug distribution charge was that he was working undercover at the time of the arrest. The Special Agent admitted having a conversation with the defendant but disputed defendant's version of the substance of the conversation. Shortly before trial, the government, belatedly, produced a typed "Debriefing Report" which purportedly reflected the critical meeting. However, subsequent investigation established that the report was written 10 months after it was dated, various agents contradicted each other concerning the making of the report, and the notes made contemporaneously with the interview were destroyed *after* they had been subpoenaed and after the defendant had testified about the conversation. The court found that the agent acted in bad faith under the circumstances. *Id.* at 1345–46, 1348. The evidence was critical to the defense, and the court found that the government's "bad faith attempts to destroy or tamper with evidence material to a defendant's guilt or innocence" went "beyond the line of tolerable human imperfection and [fell] into the realm of fundamental unfairness." *Id.* at 1349. Under such circumstances, the "only remedy available to the court [was] dismissal of the indictment." *Id.* at 1348.

In sharp contrast to those cases, in the instant case, the defendant could recreate the critical substance of the first statement and could challenge the motives of both Strong and the police in destroying the statement. Even under the defendant's version of events, the police misconduct did not come close to the fabrication of evidence and misconduct of the *Pollock* case. Moreover, the defendant's defense was that of an alibi. To the extent that others besides Strong had firsthand knowledge of the defendant's whereabouts at the critical time, the identity of such persons should have been known to the defendant. There is nothing in the record to indicate that Strong's first statement contained or could have contained information about the identity of persons who saw Olszewski during the relevant time whose identity would otherwise be unknown to Olszewski.

Nor does the fact that the written statement may have included information which was otherwise verifiable alter this court's conclusion.[6] That some parts of the first statement may have been true does not compel the conclusion that all of it was true. (Similarly, the fact that some parts of Strong's second statement may have been independently verifiable does not compel the conclusion that all of the second statement was true.)

In the instant case, there was no constitutional violation and, in light of the extensive alternate evidence available to the defendant through the examination of various witnesses, "it would offend common sense and the fair administration of justice to order a new trial." *Rosenberg v. United States,* 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959). This court recommends that the habeas petition, as it is based on the destruction of Strong's first statement, be denied.

### C. *Ineffective Assistance of Counsel*

The defendant next claims that there was ineffective assistance of counsel be-

---

**6.** The defendant suggests (without analysis) that the first statement "likely included" "verifiable facts to which Olszewski was denied access" such as "a) Strong's whereabouts immediately before and after his interaction with Olszewski, and b) the identity of other persons who Strong may have told about this interaction, c) whether Olszewski told Strong that he had just come from Cotton's Mobil." *Pet. Mem.* at 38.

cause the jury was not provided with an explanation as to why his father was not called as a witness. It was the government's theory at trial that after the defendant killed JoAnne Welch, he abandoned her vehicle at a bowling alley in Westfield. *Olszewski II*, 416 Mass. at 711, 625 N.E.2d at 533. He then called his father from a gasoline station across the street, and his father came, picked him up, and drove him home. *Id.* Olszewski's father had testified at the first trial. However, his extreme hostility toward the prosecution apparently hurt the defendant's case, although in substance the testimony supported the defendant's case, at least in part.[7] *See Pet. Mem.* at 17–18. According to the defendant, "Olszewski's father could corroborate a crucial portion of Olszewski's alibi: that he separated from Welch near his home rather than murdering her and continuing on in her car to Westfield. But counsel decided not to call the father because he was so unstable, so hostile and so vulnerable to impeachment on collateral matters that it might have poisoned the jury against Olszewski and provoked a mistrial." *Id.* at 42.

At trial, the prosecution sought and obtained the court's permission to comment during his closing on the fact that the defendant's father[8] did not testify at trial. *Olszewski II*, 416 Mass. at 722, 625 N.E.2d at 539. Specifically, the prosecutor argued that the jury could infer that the father's testimony would be inconsistent with the defendant's version of events. *Id.* at n. 16. On direct appeal, the defendant challenged the decision to allow the comment, and the SJC found that the trial judge had approached the question whether commenting on witnesses not called by the defen-

dant was allowable "carefully and with due regard for the rights of the accused." *Id.* at 723 n. 17, 625 N.E.2d at 540 n. 17. The SJC concluded that the comments were warranted in the instant case. *Id.* at 723, 625 N.E.2d at 540. In the instant Petition, the defendant contends that it was ineffective assistance of counsel not to have told the judge the reason his father was not called as a witness when the court was determining whether to allow the prosecution to comment during his closing. The Commonwealth does not address the merits of this claim, but argues that it has been procedurally defaulted. This court agrees.

### 1. *Relevant Procedural Background*

Olszewski was represented by new counsel on his direct appeal from his conviction. *Olszewski II*, 416 Mass. at 708, 625 N.E.2d at 532. In accordance with Massachusetts law, Olszewski's appeal proceeded under Mass. Gen. Laws ch. 278, § 33E, and was an appeal to the full bench of the SJC, where he received a "plenary review 'regardless of the absence of claim of error.' " *Dickerson v. Latessa*, 872 F.2d 1116, 1117 (1st Cir.1989) (internal quotation omitted). Section 33E "consigns the facts as well as the law to the SJC's consideration, gives the SJC the power and duty exercised by a trial judge on a motion for new trial, and requires the SJC to consider the whole case broadly to determine whether there was any miscarriage of justice." *Id.* at 1117–18 (internal punctuation and citations omitted).

Olszewski did not raise the claim of ineffective assistance of counsel on his direct appeal. He did, however, challenge the

---

7. As detailed, *infra,* this court finds the father's testimony equivocal at best.

8. The defendant originally objected to the prosecutor's comments regarding the failure of his sister to testify as well, but that issue is not renewed in this Petition. *See Olszewski II,* 416 Mass. at 722, 625 N.E.2d at 539.

trial court's decision to allow the prosecution to remark on the defendant's failure to call his father and sister as witnesses. *Olszewski II,* 416 Mass. at 722, 625 N.E.2d at 539. As noted above, the SJC, while recognizing "[t]he need for caution in permitting comment on witnesses not called by the defendant," concluded that the trial judge properly allowed the prosecution's argument. *Id.* at 722–23 & n. 17, 625 N.E.2d at 540 & n. 17.

On January 11, 1995, the defendant filed a *pro se* motion for a new trial pursuant to Mass. R.Crim. P. 30. (SA Ex. 5). Therein, the defendant charged that there had been ineffective assistance of counsel because trial counsel did "not bring forward witnesses for the defense who were ready and expected to be called (father, sister)" and "appellate counsel failed to argue ineffectiveness on appeal." (*Id.* at Ex. 5, p. 1). He did not raise the present grounds for his ineffective assistance claim. The trial judge denied the motion without opinion. (*Id.*). On April 7, 1997, Olszewski filed a *pro se* motion to amend his motion for a new trial wherein he added the claim that "his trial counsel rendered ineffective assistance by failing to object when the trial judge's instructions and the prosecutor's argument suggested to the jury that the defendant's father and sister would have testified to facts damaging to the defense, when the defendant's father and sister testified favorably to the alibi defense at the defendant's first trial." (SA Ex. 6, p. 2). The motion for a new trial was further amended by court-appointed counsel on or about August 30, 1999. (SA Ex. 7). Therein the defendant, through counsel, raised the claim presently included in the Petition, namely, that "counsel rendered ineffective assistance by failing to argue that one dispositive reason for their desire not to call the defendant's father was his hostile, volatile and damaging demeanor." (*Id.* at p. 38). It was the defendant's

contention that if that argument had been made, "the prosecutor would not have been allowed to make a missing witness argument . . . ." (*Id.*).

These various motions were considered by the trial court (Josephson, J.), the original trial judge having retired. (SA Ex. 9). The trial court treated the "motions to amend" collectively as a second motion for a new trial, and concluded that the issues had been waived under Mass. R.Crim. P. 30(c)(2) which provides that any grounds not raised "in his original or amended motion" for a new trial "are waived, unless the judge in his discretion permits them to be raised in a subsequent motion, or unless such grounds could not reasonably have been raised in the original or amended motion." (*See* SA Ex. 9, pp. 4–5). As the trial judge concluded:

I have examined the defendant's motion and supporting affidavits and the legal memoranda of counsel, but have not considered the merits of the issues raised. As discussed above, each of these issues were either already raised in the original new trial motion, which was argued, considered and denied, or are waived because they reasonably could have been raised in the original motion or on direct appeal. I further decline to exercise discretion to resurrect these waived issues, as the defendant has not met his burden of showing why his case is truly extraordinary so as to require consideration of the merits of the motion for a new trial.

(*Id.* at p. 6).

██ Pursuant to Mass. Gen. Laws ch. 278, § 33E, Olszewski, through counsel, sought leave from the single "gatekeeper" justice of the SJC to appeal the denial of his post-trial motions. (SA Ex. 14). Under Massachusetts law, there can be no further review of the defendant's claim

unless the gatekeeper finds that the claim raised was "new and substantial." *Simpson v. Matesanz,* 175 F.3d 200, 206 (1st Cir.1999), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 803, 145 L.Ed.2d 677 (2000). An issue is not "new" under the statute "where either it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review. The statute requires that the defendant present all his claims of error at the earliest possible time, and failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal." *Id.* at 207 (quoting *Commonwealth v. Ambers,* 397 Mass. 705, 707, 493 N.E.2d 837, 839 (1986) (internal quotation marks omitted)).

█ In the instant case, the gatekeeper denied Olszewski leave to appeal "[b]ecause the claims were either waived or fall short of the 'new and substantial' requirement set forth in G.L. c. 278, § 33[.]" (SA Ex. 16). In particular, the Single Justice carefully scrutinized the recently articulated argument that there was ineffective assistance of counsel in failing to disclose the reason why the defendant's father was not called as a witness. As the Single Justice concluded:

> given (1) the full bench's thorough evaluation of the "missing witness" issue and its ruling, after plenary review, to affirm the conviction; and (2) *the absence of any proof that counsel was constitutionally ineffective in presenting the appeal,* I find the defendant's claim is not new.

*(Id.* at 6) (emphasis added). As the Single Justice continued:

> Appellate counsel [on the direct appeal] clearly understood the magnitude of the "missing witness" issue and attacked it from one particular angle, i.e., "It was error to permit the prosecutor to argue tha[t] an adverse inference could be drawn from the defendant's failure to

call his father and sister ... and the unfair prejudice from that argument was compounded by the judge's inadequate instruction on inferences to be drawn concerning missing witnesses." The defendant now urges that "a slightly different tack," (i.e., trial counsel rendered ineffective assistance by failing to provide the reason why those witnesses were not called), should have been raised. The strategic decision to press one approach in a motion for new trial rather than another does not make the claim new.

*(Id.* at 6–7). As detailed below, the defendant argues that the Single Justice, by noting that there was no ineffective assistance of counsel in the direct appeal, in fact reached the merits of his claim and therefore did not rely on his procedural default in denying the leave to appeal. *Pet. Reply* at 13–14. Consequently, Olszewski argues, this court should address the merits of his ineffective assistance of counsel claim. This court disagrees and concludes that there was a procedural default precluding a review on the merits by the federal court.

### 2. *Standard of Review—Procedural Default*

█ "A finding by a state court that a defendant procedurally defaulted a claim bars federal habeas corpus relief on that claim unless that defendant as a petitioner shows either cause for the default and prejudice from the claimed violation of federal law, or that a fundamental miscarriage of justice will result if the claim is not considered." *Gunter v. Maloney,* 291 F.3d 74, 78 (1st Cir.2002) (citing *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The doctrine of procedural default arises out of "the long-standing rule that federal courts do not review state court decisions which

rest on 'independent and adequate state grounds.' Such independent and adequate state grounds exist where 'the state court declined to hear the federal claims because the prisoner failed to meet a state procedural requirement.' In such a case, 'considerations of comity and federalism bar the federal court's review.'" *Simpson v. Matesanz,* 175 F.3d at 205–06 (internal citations and punctuation omitted).

■ In Massachusetts, the rule that "a claim not raised is waived" is regularly enforced and "firmly established." *Gunter v. Maloney,* 291 F.3d at 79 and cases cited. Moreover, where the trial court refuses to address the merits of a claim because of a failure to raise the claim in a timely manner, "the denial of review under § 33E is an independent and adequate state ground that bars federal habeas review." *Simpson v. Matesanz,* 175 F.3d at 206. Thus, where, as here, "the state trial court found procedural waiver, did not reach the merits, and it was that decision on which § 33E review was sought and denied," then the "denial of the § 33E petition was an independent and adequate state ground." *Id.* at 206, 207.

Olszewski seeks to circumvent this result by arguing that the gatekeeper's reference to the "absence of any proof that counsel was constitutionally ineffective in presenting the appeal" establishes that the state court was not actually proceeding on the basis of his default, but, rather, was making a substantive evaluation based on federal constitutional law. *See Pet. Reply* at 13–14. This court disagrees. A reading of the entire Single Justice decision makes it clear that the court was not reaching the merits of the ineffective assistance of counsel claim. Rather, the court was merely comparing the substance and thoroughness of the claims originally presented on direct appeal with the defendant's latest argument to determine if it

was a "new" issue. *See Stewart v. Smith,* 536 U.S. 856, 860–61, 122 S.Ct. 2578, 2581–82, 153 L.Ed.2d 762 (2002) (where state court did not address the merits of ineffective assistance of counsel claim, reference by state court to "a colorable claim for ineffective assistance" not sufficient to overcome procedural default rule's application). Given the thoroughness of the direct appeal, the new challenge to the missing witness charge clearly was different only in approach, not in substance.

The defendant also relies on *Phoenix v. Matesanz,* 189 F.3d 20 (1st Cir.1999), where, based on *Simpson v. Matesanz,* 175 F.3d at 207 n. 4, the First Circuit noted "that, hypothetically, habeas review could be appropriate where a gatekeeper justice's denial under § 33E was based on findings, supported by federal law, that the petitioner's claim was new but not substantial." *Phoenix,* 189 F.3d at 25. As the court continued:

> Whether the state court decision here is or is not impervious to habeas review depends on whether it rests, expressly or inferentially, on a state-law procedural waiver (or some other state law consideration), or whether, instead, it involves the resolution of the merits of [the defendant's] federal constitutional claim .... In determining the above, the opinion of the SJC gatekeeper justice, as the "last reasoned opinion" of a state court addressing those claims, is the focus of our attention.

*Id.* (internal citations omitted).

In *Phoenix,* the court found that the issue raised was "new" but not "substantial," and in so concluding addressed the merits of the claim. *Id.* at 25. "The gatekeeper justice specifically indicated that he was not dismissing Phoenix's ineffective assistance claim *on the ground of lack of novelty or on some other theory compatible with waiver.* Instead he expressly determined that the ineffective assistance

claim lacked substance, thus reaching its merits . . . ." *Id.* at 26 (emphasis added). Therefore, the court concluded that the habeas petition was not barred on the grounds of procedural default. *Id.*

In sharp contrast, in the instant case, the gatekeeper justice made it clear that he was barring further review because the latest claim was not new—a theory which *is* compatible with waiver. He further made it clear that he was simply making a comparison of the ineffective assistance of counsel claim with the fully argued claim raised earlier—*i.e.,* the challenge to the "missing witness" argument. (SA Ex. 16 at 6–7). The earlier argument had been decided by the SJC in the direct appeal following extensive briefing by appellate counsel and scrutiny by the SJC. (*Id.* at 7). The scope of the earlier argument was noted just in the context of why the most recent claim of ineffective assistance of counsel was not new. The Single Justice clearly did not reach the merits of Olszewski's claim.[9] Therefore, there is no basis for this federal court's review of the constitutional claims.

### 3. *Exception to Procedural Default Rule*

Even assuming there was a procedural default, federal habeas review is available

if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565. Olszewski cannot meet this standard.

"In order to establish cause for the default, petitioner must demonstrate 'that some objective factor external to the defense impeded [defense] counsel's efforts to comply with the State's procedural rule.'" *Magee v. Harshbarger,* 16 F.3d 469, 471 (1st Cir.1994) (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Here, there was no external factor which precluded trial counsel from notifying the court about the alleged reason the defendant's father was not called as a witness. Similarly, appellate counsel did not raise the issue on direct appeal even though nothing prevented him from doing so if he felt it was meritorious. Thus, Olszewski cannot satisfy the "cause" requirement.[10]

Even assuming Olszewski could establish "cause" to excuse the procedural default, he cannot establish prejudice. " 'The question is not whether the defendant

---

**9.** Even if the gatekeeper's reference to the presentation of appellate counsel on the direct appeal is viewed as a review of the ineffective assistance of (both trial and appellate) counsel claim, such a "limited review" would "not undercut the adequacy and independence of the state grounds." *Phoenix,* 189 F.3d at 26 n. 2 (quoting *Burks v. Dubois,* 55 F.3d 712, 716 n. 2 (1st Cir.1995)). *See also Brewer v. Marshall,* 119 F.3d 993, 999 (1st Cir.1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1172, 140 L.Ed.2d 182 (1998).

**10.** While ineffective assistance of counsel may constitute "cause" for failing to object at trial, that claim must be exhausted below before it can be raised in a habeas petition. *See Gunter v. Maloney,* 291 F.3d at 81, and cases

cited; *Edwards v. Carpenter,* 529 U.S. 446, 453, 120 S.Ct. 1587, 1592, 146 L.Ed.2d 518 (2000) ("an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted . . . ."). Olszewski did not raise an ineffective assistance claim based on this failure to notify the judge of the reason his father was not called a witness either in his direct appeal or in his first motion for a new trial. "Moreover, a substantive claim that is procedurally defaulted cannot be revived by being repackaged in a collateral proceeding as a claim of ineffective assistance of counsel." *Manisy v. Maloney,* 283 F.Supp.2d 307, 313 n. 7 (D.Mass.2003).

would more likely than not have received a different verdict,'" but whether "'he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Strickler v. Greene*, 527 U.S. 263, 289–90, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)). In the instant case, Olszewski has failed to establish that taking a different tack to challenge the prosecutor's ability to reference the "missing witness" in his closing calls into question whether he received a fair trial worthy of confidence. *See Derman v. United States*, 298 F.3d 34, 45 (1st Cir.), *cert. denied*, 537 U.S. 1048, 123 S.Ct. 636, 154 L.Ed.2d 522 (2002), and cases cited. There was obviously substantial evidence against the defendant from Strong's testimony regarding the defendant's confession—an alleged confession which included a level of detail which would most likely be known only to the killer. *Olszewski II*, 416 Mass. at 724–25, 625 N.E.2d at 541. Moreover, there was also evidence of guilt in the form of the defendant's phone call to a friend, made only hours before the victim's body was found, saying the defendant was "only kidding" when he said he would kill Welch. *Id.* at 711, 625 N.E.2d at 533. Similarly, additional evidence of guilt included the defendant's failure to answer another friend when he asked the defendant "why did you do it?" *Id.* There was, in sum, evidence of motive, opportunity and evidence of consciousness of guilt, in addition to the direct evidence of guilt which supports the verdict. Olszewski cannot establish prejudice in the instant case.

Finally, "[e]ven absent a showing of cause and prejudice, a federal court exercising its habeas powers should nonetheless overlook a procedural default and hear a barred constitutional claim on the merits if its failure to do so would result in a fundamental miscarriage of justice." *Burks v. Dubois*, 55 F.3d at 717. As the *Burks* court explained:

> This is a narrow exception to the cause-and-prejudice imperative, seldom to be used, and explicitly tied to a showing of actual innocence .... To be sure, a habeas petitioner need not prove his innocence beyond all doubt in order to reach the safe haven of the miscarriage exception: it suffices if the petitioner can show a probability that a reasonable jury would not have convicted but for the constitutional violation.

*Id.* at 717–18 (internal citations omitted). Olszewski has not met this burden. Therefore, this court recommends that the habeas petition insofar as it relates to a claim of ineffective assistance of counsel for failure to inform the trial judge of the reason why his father was not called as a witness be denied.

### 4. *The Failure to Call the Defendant's Father As Ineffective Assistance of Counsel*

The defendant argues in one paragraph that trial counsel was constitutionally ineffective for failing to call his father as a witness because "counsel should have known that the prosecutor would be permitted to make a missing witness argument" as a result of which "they had no choice but to call the father to corroborate Olszewski's alibi ...." *Pet. Mem.* at 49. In view of the apparently harmful effect of the father's testimony at the first trial, this argument is clearly without merit. Even the defendant does not seriously assert that the strategic decision was in error, much less was "so serious [an error] as to deprive the defendant of a fair trial ...." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

**D.** *The Prosecutor's Closing*

Olszewski contends that his conviction must be reversed because the prosecutor's misconduct during his closing "infected the trial with unfairness" in violation of his constitutional rights as recognized by *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), and *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In particular, the defendant challenges the cumulative effect of various alleged errors made by the prosecutor in his closing, including making knowing misstatements that (1) the reason Olszewski's father was not called as a witness was that he would have testified against Olszewski; (2) the jury could infer consciousness of guilt from Olszewski's alleged failure to express sympathy when Ms. Welch's body was found; and (3) that the alibi witnesses' testimony should be discounted because they did not provide the information until eight years after Ms. Welch's death. The defendant further objects to the prosecutor's reference to excluded testimony to the effect that Michael Foley believed Olszewski had killed Welch, and to his argument referencing his personal certainty in Olszewski's guilt. *Pet. Mem.* at 55.

The SJC reviewed these matters and concluded that they did not warrant a new trial. *Olszewski II*, 416 Mass. at 725–27, 625 N.E.2d at 541–42. As detailed further below, this court finds that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

**1.** *The Federal Standard*

"There are only two circumstances under which prosecutorial misconduct rises to the level of constitutional error. The first is where the prosecutor's conduct infringes upon a specific right, such as the privilege against compulsory self-incrimi-

nation or the right to counsel." *Pagano v. Allard*, 218 F.Supp.2d 26, 33 (D.Mass. 2002). That situation is not present in the instant case. The second situation, which is relevant to the instant case, arises "even if a prosecutor's misconduct does not infringe upon a specific constitutional right"—"[the conduct] can still violate the Due Process Clause of the United States Constitution by rendering the underlying trial 'fundamentally unfair.'" *Id.* at 33–34. As the Court held in *Darden v. Wainwright*:

> The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* at 642, 94 S.Ct. at 1871.

*Wainwright*, 477 U.S. at 181, 106 S.Ct. at 2471.

"In determining whether a prosecutor's misstatements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,' courts tend to consider various factors such as the severity of the misconduct, the sufficiency of any curative judicial instructions, and the likelihood that the misconduct affected the outcome of the case." *Pagano v. Allard*, 218 F.Supp.2d at 34, and cases cited. *See also United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir.1993) (in determining whether a new trial is required, court considers the "severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against the defendant") (quot-

ing *United States v. Ingraldi,* 793 F.2d 408, 416 (1st Cir.1986)). It "is not enough that the prosecutors' remarks were undesirable or even universally condemned" to constitute a violation of the defendant's due process rights. *Wainwright,* 477 U.S. at 181, 106 S.Ct. 2464 (internal quotation omitted). Applying these principles to the instant case compels the conclusion that the Petition must be denied.[11]

### 2. *The Alleged Intentional Misstatements*

■ Olszewski contends that intentional misstatements by the government rendered the trial unfair. It is recognized that due process prohibits a prosecutor from making "knowing use of false evidence." *Tankleff v. Senkowski,* 135 F.3d 235, 253 (2d Cir.1998) (internal citations omitted). Nevertheless, it is also clear that not all errors warrant a new trial. *Id.* In the instant case, not all errors claimed by the defendant were, in fact, errors. Moreover, they did not individually or cumulatively render the trial unfair.

### a. *The Father's Testimony*

■ The first alleged knowing misstatement was the "missing witness argument" whereby the prosecutor argued that Olszewski's father was likely to have testified adversely to Olszewski. The defendant contends that the prosecutor wrongfully "asked the jury to infer that Olszewski did not call his father as a witness because the father would have testified that, contrary to Olszewski's alibi and consistent with Strong's second statement,

the father picked Olszewski up in Westfield near Welch's bloody abandoned car. But the prosecutor knew that the father gave testimony (under oath and subject to cross-examination) *consistent* with Olszewski's alibi at the first trial, placing him in [sic] near their family home in West Springfield." *Pet. Mem.* at 51 (emphasis in original). However, the record does not support the defendant's contention that this constituted a knowing use of false testimony.

At the first trial, the defendant's father testified that on January 28 he did not see JoAnne Welch arrive at his home. (A.181). He further testified, first, that he did not see her car that day, and, later, that at around 6:00 p.m. he opened his front door and "noticed JoAnne's car pulling away up the street in a northerly direction and [his] son walking in the opposite direction." (A.181–82, 183). He did not, however, see who was in her car. (A.225). At about 6:30 p.m., after picking up some groceries at the Big Y Supermarket, he picked up his son on Hillcrest Avenue and brought him home. (A.183–84). His son then took the groceries into the basement, picked up his keys and left.[12] (A.184).

On cross-examination, the defendant's father testified that he went shopping at the Big Y, and to get to the store "you go out to Westfield Street and take a left . . . you drive over into Westfield or close to the border of West Springfield and Westfield and the Big Y is on the left-hand side of the river." (A.194). According to

---

**11.** Since the state court did not address the constitutional issues raised by Olszewski with respect to the errors in the prosecutor's closing arguments, this issue will be reviewed *de novo. Fortini v. Murphy,* 257 F.3d at 47.

**12.** It was the Commonwealth's theory that Ms. Welch was murdered after she left the defendant's house on the evening of January

28th. (*See* A. 377–79). Thus, the defendant's father could not, in fact, give the defendant an alibi for the "crucial period" between 7:00 p.m. and 9:00 p.m. *Olszewski II,* 416 Mass. at 710, 625 N.E.2d at 533. All he could do would be to deny that he went out and picked up his son later.

Strong's testimony, the defendant had told him that after the murder his father picked him up in Westfield. (A.196–97). Thus, at the first trial, while the defendant's father denied picking the defendant up at the location Strong testified to, he did admit to being near the relevant location on the relevant day (Westfield Street—albeit in West Springfield not Westfield), and driving his son home (albeit at a different time). (A.197–99). Thus, this court does not find the father's testimony to be unequivocally supportive of the defendant's case, as the defendant suggests.

In his closing argument at the second trial, the prosecutor first addressed Olszewski's theory that the government fabricated the case against him. (A.368–69). The prosecutor then discredited the testimony of the witnesses who had purported to see Olszewski at the relevant times. (A.369–74). The prosecutor then addressed Strong and the destruction of his first statement, and then reviewed how the crime, from the government's point of view, occurred. (A.374–80). According to the Commonwealth, after the body was left at Shaker Road, the government claimed that "the defendant went to Points East Lounge and called his father for a ride home." (A.380). The prosecutor continued:

> And, ladies and gentlemen, his father has been here for two weeks sitting here watching this case. You can infer by the fact that he didn't get up and tell you that he didn't pick him up, didn't pick up his son, you can infer from that, ladies and gentlemen, that he did pick up his son in Westfield. That's what you can infer, that he didn't pick up his son at the corner of Hillcrest and Miami, but he picked up his son in Westfield.

(*Id.*).

The prosecutor went on at length discussing the other witnesses who did testify, including a friend who testified that soon before the victim came to the house the defendant had threatened to kill her, and then the next day, before the body was found, the defendant called and said he was just kidding. (A.383–86). Another friend testified that the defendant did not react when asked why he had done it. (A.387). Strong's testimony and prior statements were also addressed at length. (*E.g.*, A. 388–92).

The defendant claims that the prosecutor knew his father would have testified on his behalf, and, therefore, deliberately misled the jury in making his missing witness argument. Given the confusing nature of the father's testimony at the first trial, it cannot be said that the government made "knowing use of false evidence" when the prosecutor argued that the jury could infer that his testimony would not support the defendant. This conclusion is buttressed by the fact that the defendant's father was viewed as too erratic and uncontrollable to be called as a witness. The cases on which the defendant relies involve improper arguments about unmistakable facts, and have no application to the instant case. *Compare United States v. Valentine*, 820 F.2d 565, 570 (2d Cir.1987) (prosecutor's "repeated statements or implications that all of the broker nonwitnesses who received checks received loans" were inconsistent with and contrary to the grand jury testimony of four such brokers, and required reversal of conviction of making false material declaration under oath before grand jury); *United States v. Udechukwu*, 11 F.3d at 1106 (new trial ordered where government failed to disclose exculpatory information and prosecutor deliberately and falsely argued that defendant's story about the existence of a drug dealer had been fabricated, although the government knew the individual did, in fact, exist).

Moreover, based on the evidence before the trial court, it did not violate the defendant's constitutional rights to allow the "missing witness" argument. As detailed above, the SJC found that the trial judge "engaged in a thorough colloquy with counsel, and took appropriate factors into account, before ruling that the prosecutor could comment on the defendant's failure to call certain witnesses." *Olszewski II,* 416 Mass. at 723 n. 17, 625 N.E.2d at 540 n. 17. The relevant factors "that must be considered before comment is permitted include the strength of the case against the defendant, and whether, if innocent, he would be expected to call the witnesses ..., and the importance of the witnesses' testimony to the defense .... Comment is not permissible if it appears that the evidence would be merely cumulative, corroborative of other testimony, or peripheral to the question of innocence." *Id.* at 724, 625 N.E.2d at 540 (internal citations omitted). After reviewing these factors, the SJC concluded that the argument was proper. *Id.* at 724–25, 625 N.E.2d at 540–41.[13] Since the argument was not improper, there is no basis for the claim that its admission unfairly tainted the trial.

Finally, even if it was error for the prosecutor to argue that the adverse inference should be applied, no habeas relief is warranted. The instant case is similar to *Tankleff v. Senkowski,* 135 F.3d 235 (2d Cir.1998). There, the prosecutor (improperly) argued that the jury should draw an adverse inference about a witness' failure to testify about a phone conversation when the witness' testimony under oath at a pretrial suppression hearing corroborated that of the defendant. *Id.* at 252. The

court found that "the prosecutor's comments were short and fleeting," and that "the trial judge instructed the jury that the burden of proof always rests with the prosecution and that the attorneys' arguments on summation are not evidence," although he erroneously refused to give a more specific instruction. *Id.* at 253. In conclusion, the court found "that the standard instructions given by the trial court were probably sufficient to cure any harm that the prosecutor's misstatements may have caused." *Id.* Moreover, the court was "not prepared to say that this is a case in which the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury." *Id.* For the same reasons, even assuming the prosecutor's statements about the defendant's father's testimony were improper, Olszewski "has not met his burden of showing that he was substantially prejudiced" thereby. *Id.*

#### b. *Lack of Remorse*

■ The next misstatement about which defendant complains was the argument that the "last time the Welch family heard from the Olszewski family" was when the Welch family was looking for their missing daughter. (A.377). Apparently, however, Olszewski did attend the wake. There was an objection to the statement and, as the SJC found, an immediate curative instruction. "It was stressed to the jury that their memory of the evidence must control" and they were told to "disregard the prosecutor's claim that the defendant never expressed sympathy for the victim's death." *Olszewski*

---

**13.** The SJC also found that while a more detailed charge limiting the jury's application of the adverse inference to the situation where the jurors "were persuaded of the truth of the inference beyond a reasonable doubt" may have been warranted, the absence of

such a charge did not create a "substantial likelihood of a miscarriage of justice." Since there was no objection to the charge, the SJC's review was limited to a miscarriage of justice analysis. *Olszewski II,* 416 Mass. at 724 n. 18, 625 N.E.2d at 540.

*II*, 416 Mass. at 726, 625 N.E.2d at 541. The SJC concluded further that while it was improper for the prosecutor to refer to the defendant's possible lack of remorse for the victim's death, the actions of the judge in "promptly and forcefully instruct[ing] the jury to disregard these aspects of the prosecutor's closing argument ... was sufficient to protect the defendant's rights." *Id.* at 727, 625 N.E.2d at 542. This court agrees. The trial judge's curative instruction "was an adequate antidote to the prejudice occasioned by the remark." *Borodine v. Douzanis,* 592 F.2d 1202, 1212 (1st Cir.1979).

#### c. *Alibi Witnesses*

The final alleged misstatement was an argument made in passing that several alibi witnesses were mistaken and should not be believed because their information did not come forward for 8 years after the crime. (A.371). At least one witness had, however, testified at the first trial. *See* SA Ex. 2 at 73–74 (Pet. Br. to SJC). As Olszewski agrees, this alleged error was not challenged at trial, and the misstatement can only be considered as part of the cumulative effect of various claimed errors on the fairness of the trial. *See Pet. Reply* at 16–17. Even if this court were to consider this claim individually, this fleeting reference in the midst of a detailed challenge to the veracity of these alibi witnesses' testimony did not improperly taint the trial.

#### 3. *Reference to Excluded Testimony*

 The prosecutor argued that a witness, Michael Foley, had testified that he believed that Olszewski had killed Welch, but that testimony had been excluded. (A.388). Again the trial judge immediately gave a curative instruction and the jury "were told to ignore any argument or testimony that they might have heard as to one

of the witnesses expressing an opinion that the defendant was guilty[.]" *Olszewski II,* 416 Mass. at 726, 625 N.E.2d at 541. As the SJC concluded, while "[i]t was improper for the prosecutor to refer to evidence that had been excluded," the curative steps undertaken by the trial judge "was sufficient to protect the defendant's rights." *Id.* at 727, 625 N.E.2d at 542. As before, this court agrees that the "strong curative instruction" in the jury charge "adequately obviated the prejudice which may have been occasioned by the prosecutor's improper remarks." *Borodine v. Douzanis,* 592 F.2d at 1211.

#### 4. *Expressions of Personal Opinion*

Finally, Olszewski takes exception to the closing to the extent that the prosecutor injected his personal opinion into the argument. As Olszewski contends:

> Making himself the government's chief witness, the prosecutor argued that "there is *no fear in my voice* when I say to you that either Phil Strong killed this girl or the defendant killed her. *Absolutely none.*" He twice returned to the theme that Strong must be either the killer or truthfully accusing Olszewski. Stating his personal resolution of this proposition, the prosecutor praised Strong and excused the inconsistencies in his testimony: "Strong is truthful with not the greatest memory."

*Pet. Mem.* at 55 (internal citations omitted). The SJC fully reviewed this argument and concluded as follows:

> "Where credibility is at issue, it is certainly proper for counsel to argue from the evidence why a witness should be believed." *Commonwealth v. Thomas,* 401 Mass. 109, 116, 514 N.E.2d 1309 (1987), but a prosecutor should not personally vouch for the credibility of a witness. *Id.* at 114–115, 514 N.E.2d 1309. However, a single "unfortunate

and unartful isolated instance[ ] of the use[ ] of the first-person pronoun," *id.* at 115, 514 N.E.2d 1309, in the course of a legitimate argument as to the inferences the jury should draw from the evidence does not constitute a significant error. *Id.* As we have noted, Strong's account of the defendant's confession carried its own indicia of reliability in its detailed account of the injuries inflicted on the victim. The prosecutor properly could argue that only the victim's assailant would have knowledge of the extent and kind of her injuries. Comment concerning the probable source of Strong's knowledge of those injuries was also proper.

*Olszewski II,* 416 Mass. at 726, 625 N.E.2d at 541–42.

■ The defendant has not established a violation of his constitutional rights. The court immediately instructed the jury that "anything that counsel says in closing argument is not evidence." (A. 402; *see also* A. 397–98 (sidebar discussion)). To the extent that the challenged statements can be viewed as a statement of personal opinion, they were not sufficient to render the trial unfair. While Strong's credibility was a critical component of the case against Olszewski, the parties had the opportunity to fully present and argue "all of the many factors which made it susceptible to impeachment[.]" *Patriarca v. United States,* 402 F.2d 314, 322 (1st Cir.1968). Thus, "viewing the case as a whole, the arguments, and the charge, we cannot find any possibility of prejudice." *Id.* (while prosecutor's expression of personal belief may have been improper, it was not prejudicial).

The instant situation is factually distinguishable from *United States v. Gonzalez Vargas,* 558 F.2d 631 (1st Cir.1977), on which defendant relies. In *Gonzalez Vargas,* the prosecutor repeatedly told the jury what he "personally believe[d]" and what he believed he had proven. *Id.* at 633. Despite objection, the court refused to give a curative instruction, but, instead, indicated that it was proper argument. *Id.* at 632. Thus, unlike the instant case, *Gonzalez Vargas* did not involve a fleeting reference followed by a curative instruction.

### 5. *Cumulative Effect*

■ Olszewski argues that the cumulative effect of these errors in the closing was highly prejudicial and so infected the trial with unfairness that it resulted in an unfair trial in violation of his constitutional rights. *See Thomas v. Hubbard,* 273 F.3d 1164, 1179 (9th Cir.2001) (considering cumulative effect of errors). This court has reviewed the entire closing, as well as the alleged errors, and concludes that the defendant was not unfairly prejudiced. The transgressions were not significant, there was not intentional misconduct, the court gave curative instructions and the case against the defendant was strong, albeit circumstantial. Moreover, "because this is a petition for a writ of habeas corpus, the mere fact that the prosecutor's statement was erroneous or prejudicial is insufficient to justify the intervention of this Court .... Instead, this Court is limited to reviewing state court proceedings for constitutional error." *Pagano v. Allard,* 218 F.Supp.2d at 33 (internal citation omitted). In the instant case, the defendant has not established that his constitutional rights were violated by the prosecutor's closing argument. Nor has Olszewski established that affirming the conviction was "contrary to, or involved an unreasonable application of, clearly established Federal Law as determined by the Supreme Court of the United States." *Id.* at 36–37 (quoting 28 U.S.C. § 2254(d)(1)). Consequently, the

petition for writ of habeas corpus based on the prosecutor's closing should be denied.

### E. *The Dismissal of a Juror*

Olszewski's final ground for his petition is his claim that he was deprived of his constitutional right to a trial by a jury of his selection when the trial judge discharged a seated juror as a result of *ex parte* communications with the juror. For the reasons detailed below, this argument does not state a claim for a violation of the defendant's constitutional rights. Briefly, the relevant facts, which are detailed more fully in *Olszewski II*, 416 Mass. at 720–21, 625 N.E.2d at 538–39, are as follows.

The jury was impaneled in Pittsfield in Berkshire County, and was going to be sequestered in Springfield in Hampden County. One prospective juror claimed that sequestration would be both a financial and personal hardship, as his wife was ill and on oxygen, and he would need someone to stay with her. Nevertheless, this individual was chosen as one of 16 jurors. The judge and counsel left Pittsfield when jury selection was complete, intending to meet in Springfield the next day to begin trial. The jurors were escorted to their homes by court officers in order for them to collect their belongings in anticipation of sequestration.

When the one juror went home, his wife became distraught at the prospect of being alone, the juror refused to leave her alone and there was no one else available to stay with the wife. The court officer phoned the judge and advised him of the situation. The judge called the wife's doctor who confirmed that she could not be left alone. Meanwhile, the juror's son had called from the eastern part of Massachusetts and insisted his mother could not be left alone. The judge excused the juror from further service due to hardship, and advised counsel the next morning.

The SJC rejected the defendant's contention that "the judge's decision to discharge the juror without consulting the defendant violated his Federal constitutional right 'to have his trial completed by a particular tribunal.' *United States v. Jorn*, 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)." *Olszewski II*, 416 Mass. at 720–21, 625 N.E.2d at 538. As the SJC held:

> Federal case law does not support the defendant's contention. As two commentators have observed: "[T]he judge's action in excusing a juror [prior to deliberations] will be upheld 'if the record shows some legitimate basis for his decision.' (*United States v. Peters*, 617 F.2d 503, 505 (7th Cir.1980)). This is because the defendant has still been tried by 12 persons selected by him, with even those originally designated as alternates being selected in the same fashion as the other jurors." (Footnotes omitted). 2 W.R. LaFave & J.H. Israel, Criminal Procedure § 21.3, at 742 (1984) .... The defendant participated in the selection of sixteen jurors, of whom the juror above was one, and declared himself satisfied with the panel. The record demonstrates that requiring service of the juror would have caused extreme hardship, unquestionably a legitimate basis for discharge .... There was no violation of the defendant's federally protected rights.

*Olszewski II*, 416 Mass. at 721, 625 N.E.2d at 538–39 (citations omitted). The Court went on to add that while "the discharge of the juror without a hearing did not comport with the requirement that the defendant be present," as found in Mass. Gen. Laws ch. 234A, § 9, "no prejudice resulted from the error." *Id.* at 721–22, 625 N.E.2d at 539.

As an initial matter, the Respondent contends that there is no Supreme Court precedent governing Olszewski's claim that the trial judge violated his constitutional rights, and, consequently, that this claim is not appropriately raised in a habeas petition. *Resp. Opp* at 23–25. However, as the defendant argues, the Supreme Court has recognized that a "prisoner is entitled to an impartial jury composed of persons not disqualified by statute" and that, consequently, the defendant has the right, guaranteed by the Constitution, to be present during jury selection. *Hopt v. Utah*, 110 U.S. 574, 578–79, 4 S.Ct. 202, 204–05, 28 L.Ed. 262 (1884). *See also Lewis v. United States*, 146 U.S. 370, 375–76, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) (defendant has right to be present when challenges to potential jurors are made). Moreover, the Supreme Court has recognized "that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant" which are implicated in addressing *ex parte* communications between a trial judge and juror. *Rushen v. Spain*, 464 U.S. 114, 117–18 & n. 2, 104 S.Ct. 453, 455 & n. 2, 78 L.Ed.2d 267 (1983). Finally, the Supreme Court has recognized that "[t]he right to a fair and impartial jury entitles a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence." *Peek v. Kemp*, 784 F.2d 1479, 1484 (11th Cir.1986), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986) (citing *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)). Based on all these principles, courts have frequently addressed the propriety of *ex parte* communications between the judge and jurors, as well as the dismissal of jurors, in the context of habeas petitions. *See, e.g., Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (habeas petition challenging *ex parte* communication between trial judge and juror); *Peek v. Kemp*, 784 F.2d 1479 (habeas petition challenging dismissal of impaneled juror); *Green v. Zant*, 715 F.2d 551 (11th Cir.1983) (habeas petition challenging dismissal of juror during deliberation). Consequently, the merits of Olszewski's challenge to the dismissal of the juror is appropriately before this court.

Nevertheless, federal law does not support the defendant's contention that the *ex parte* dismissal of an empaneled juror "is constitutional error" in all circumstances. *See Pet. Reply* at 18. First of all, there is a clear distinction between being present when the jury is selected, and being present when a juror is discharged and, in effect, replaced with an alternate who had already been approved by the defendant. While the right to be present for the initial selection is constitutionally guaranteed, the latter involves more of an administrative task. *See* 2 Charles Alan Wright, Nancy J King, Susan R. Klein & Peter J. Henning, Federal Practice and Procedure: Criminal 3d § 388 (2000) ("The substitution of an alternate for a juror for reasonable cause is within the prerogative of the trial court and does not require the consent of any party. The court has discretion in deciding when to make such a substitution."). *See also* Fed.R.Crim.P. 24(c) (alternate jurors selected "to replace any jurors who are unable to perform or who are disqualified from performing their duties").

Furthermore, at most, the trial judge's action in communicating with a juror *ex parte* is to be reviewed on a "harmless error" basis. *See Rushen v. Spain*, 464 U.S. 114, 118–19, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (trial judge's *ex parte* communication with a juror mid-trial, who continued to participate in trial, found to be harmless error); *United States v. Flah-*

*erty,* 668 F.2d 566, 602 (1st Cir.1981) (*ex parte* communications between judge and jury subject to harmless error rule). Similarly, "[t]he decision to substitute an alternate juror is committed to the sound discretion of the trial court" and will not be disturbed "absent a showing of bias or prejudice to the defendant." *United States v. Corsino,* 812 F.2d 26, 33 (1st Cir.1987) (quoting *United States v. Smith,* 550 F.2d 277, 285 (5th Cir.1977)) (additional citations omitted) (court finds argument "frivolous" that trial judge erred in replacing juror who did not come to court on second day of trial without making any inquiry as to why she was not present). Thus, a juror may not be discharged without any factual support, "or for a legally irrelevant reason." *United States v. Rodriguez,* 573 F.2d 330, 332 (5th Cir.1978). "There must be some 'sound' basis upon which the trial judge exercised his discretion." *Id.* (judge properly discharged juror who called to say he chose to go to work instead of court, despite defendant's objection).

■■ Applying these principles to the instant case compels the conclusion that the discharge of the juror and the *ex parte* communications leading up to the discharge did not violate the defendant's constitutional rights. The court was faced with a juror who refused to appear in court and refused to leave his wife. The wife's physician confirmed her physical need to have someone stay with her. Under such circumstances, it was not an abuse of discretion for the trial judge to replace the juror. The present situation is similar to that in *United States v. Evans,* 352 F.3d 65, 69–70 (2d Cir.2003), where the trial judge contacted a juror at home after the juror had an asthma attack in court and, based on that conversation, excused the juror without prior notice to the parties. As the *Evans* court held in language applicable here:

> In this case, the *ex parte* communication occurred during the trial and well before the case was sent to the jury. There is, moreover, no indication that the remaining jurors were adversely influenced by the communication. Nor did the dismissal produce a drastic shift in the jury's composition. *Cf. United States v. Hanno,* 21 F.3d 42, 48 (4th Cir.1994) (holding judge's failure to consult counsel before excusing six jurors to be prejudicial); *United States v. Gay,* 522 F.2d 429, 435 (6th Cir.1975) (finding discharge of three jurors prejudicial given "total absence of a record").

> We find that the court properly exercised its discretion in discharging a single juror whose asthma attack could have unduly delayed an already lengthy trial. Although the court was ill-advised to exclude counsel from its discussion with, and decision concerning, the juror, we are persuaded that the communication in no way contributed to defendants' convictions. *See Chapman [v. California,* 386 U.S. 18, 23–24, 26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ]. The [Fed. R.Crim.P.] Rule 43 violation [providing a defendant must be present at "every trial stage"] was harmless under the circumstances presented here.

*Id.* at 70.

Olszewski also claims that the trial judge's "offhand two-sentence post-hoc recitation of the matter the following morning" was an insufficient record of what transpired, thereby requiring an inference that Olszewski was prejudiced by the juror's removal. *Pet. Mem.* at 60. This argument is without merit. While some courts have indicated the need for a record to be created in order to enable the court's decision to be reviewed for abuse of discretion, no specific form of record has

been mandated. *See, e.g., United States v. Gay*, 522 F.2d 429, 435 (6th Cir.1975) (where *ex parte* communication with jurors following court's unilateral decision to sequester jurors resulted in three jurors being dismissed, and no record of conversations made, conviction reversed). Here, the reason for the judge's actions were reflected in the record and were, therefore, subject to review. That is sufficient. *See United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir.1992) (trial judge properly excused juror who called in sick and replaced her with an alternate without prior notice to the parties; even though defendant not given opportunity to develop facts for the record, judge's decision reviewable and found not to be an abuse of discretion). There is no abuse of discretion where, as here, "the record shows some legitimate basis" for the trial judge's decision. *United States v. Peters*, 617 F.2d 503, 505 (7th Cir.1980) (court properly replaced late juror).

The SJC in the instant case also noted that the defendant would undoubtedly not have objected to discharging the juror because "of the concern the defense had expressed about the attitude of other jurors seeking discharge based on hardship" and because defense counsel only objected "for the record" "but expressed no particular concern . . . ." *Olszewski II*, 416 Mass. at 722, 625 N.E.2d at 539. Olszewski challenges this conclusion, and argues further that he made "critical judgments about composing the jury" based on the juror's presence on the jury. *Pet. Mem.* at 61. Since the decision to replace the juror was within the judge's sole discretion, it does not matter whether the SJC properly gleaned the defendant's intent from the record. Moreover, since the juror's adamant refusal to leave his wife alone was not known to anyone at the time of jury selection, the fact that the defendant may have acted differently if he had known the juror would be excused in the future is irrelevant as well. Alternate jurors are picked to "replace any jurors who are unable to perform or who are disqualified from performing their duties." Fed. R.Crim.P. 24(c). In the instant case, a juror became unable to perform his duties. The defendant's constitutional rights were not violated when an alternate, who had been previously approved by the defendant, was seated.

## IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Petition for Writ of Habeas Corpus be DENIED.[14]

---

14. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88